852 So.2d 712 (2002)
SOUTHERN BAKERIES, INC.
v.
Ray KNIPP and David Branyon.
1010743.
Supreme Court of Alabama.
December 13, 2002.
*713 C. Paul Cavender and Robert E. Battle of Burr & Forman, L.L.P., Birmingham; and Michael R. LaBarge and Bruce W. Lyon of LaBarge, Campbell & Lyon, L.L.C., Chicago, Illinois, for appellant.
Scott P. Hooker, Birmingham, for appellees.
SEE, Justice.
In February 1995, Sassib, an Italian manufacturer of ovens, hired Lotus Southwest to install a new oven at the facility of Tatum Bakers, Inc.,[1] in Birmingham. Ray Knipp was an employee of Lotus Southwest and was assigned the job of removing the old oven and installing the new one. In March 1995, Knipp spoke with Ray Downey, the president of Southern Bakeries, Inc. ("SBI"), about removing the old oven. Downey told Knipp that if Knipp could find someone to buy the old oven, he would pay Knipp a percentage of the sales price. Knipp claims that he asked Downey at that time whether an environmental study had been performed on the oven. Knipp also claims that he told Downey that in order for Knipp to be able to find a buyer, the study would have to show that the oven was toxin free.
In late 1995 or early 1996, Bob Wagnon, the head of maintenance at Tatum Bakers, told Knipp that the test results indicated that the oven was free of asbestos. In March 1996, as he was preparing to remove the oven, Knipp asked Downey if he could see the report that indicated the oven was free of asbestos. Knipp claims that Downey told him that he did not know what happened to the report. Knipp claims that, in May 1996, he again asked Downey for the report, and that Downey provided Knipp with a five-page document *714 that stated that no asbestos had been detected in the oven.
Knipp states that about a week after he removed the oven, Downey asked him where the oven was located. Knipp told him that the oven had been sold to someone in Jamaica. Knipp claims that Downey told him that he was glad the oven was out of the country. Knipp claims that after he heard this, he became skeptical about Downey's representations that the oven was free of asbestos. In July 1996, Knipp had samples of the insulation tested. He had allegedly taken the samples from the insulation around the oven when he removed it. The tests indicated that the oven's insulation contained asbestos. Knipp claims that Downey admitted that the report he gave Knipp was inaccurate in its representation that the oven contained no asbestos.
On December 2, 1998, Knipp sued SBI. In the second amended complaint, David Branyon joined the action as a plaintiff. Branyon had helped Knipp remove the oven from the Tatum Bakers facility. Knipp and Branyon alleged (1) negligent or wanton failure to warn them that the oven contained asbestos; (2) fraudulent suppression; (3) negligent, reckless, or intentional representation; and (4) negligent or wanton failure to train employees, namely, Ray Downey. In each count, Knipp and Branyon sought compensation for "extreme emotional distress and mental anguish," on the ground that because of their exposure to asbestos in removing the oven from the Tatum Bakers facility they "are at a greater risk of developing lung cancer and other diseases of the lungs in the future." On August 14, 2001, SBI moved for a summary judgment.[2] SBI argued that Knipp and Branyon had failed to provide any evidence of a physical manifestation of injury from the alleged asbestos exposure and failed to provide any evidence indicating that it is more likely than not that they are going to contract an asbestos-related disease from the alleged exposure. In response to SBI's motion for a summary judgment, Knipp and Branyon submitted the deposition testimony of their expert, Dr. Allen Cooper; Dr. Cooper testified that, based on epidemiological studies, Ray Knipp has "a 200, 300 percent increased chance" of developing lung cancer and mesothelioma because of his exposure to asbestos at the Tatum Bakers facility.[3] Knipp and Branyon further stated that Dr. Cooper offered the opinion that Branyon's risk of developing lung cancer and mesothelioma could be higher or lower than Knipp's risk, depending upon Branyon's individual susceptibility.
On December 17, 2001, the trial court entered a summary judgment for SBI as to "any claims by [Knipp and Branyon] that they are more likely than not to develop lung cancer almost three decades later." However, the trial court denied SBI's summary-judgment motion "to the extent that [Knipp and Branyon's] causes of action arise from the present damage." The trial court's order further recognizes that "[Knipp and Branyon's] primary concerns are the claimed emotional damage as a result of the fraudulent and wanton behavior of [SBI] and the fear that at some time in the future they will develop lung cancer or other health problems."
*715 The trial court stated that its order "involves a controlling question of law as to which there is a substantial ground for difference of opinion, that an immediate appeal from this amended order would materially advance the ultimate termination of the litigation and the appeal would avoid protracted and expensive litigation." This Court granted SBI permission to appeal. See Rule 5, Ala. R.App. P. SBI states that the controlling question of law is "[w]hether the trial court incorrectly held that [Knipp and Branyon] can recover any damages for their fear of developing cancer when (1) they have no physical manifestation of the injury; (2) their own expert witness has testified that they will not develop an asbestos-related disease for twenty-nine years after exposure, if ever; and (3) their own expert witness has testified that there is a more likely chance that [Knipp and Branyon] will not develop an asbestos-related cancer."[4]
SBI argues on appeal that Knipp and Branyon's claims should be dismissed (1) because they have failed to show that they have suffered any present injury, and (2) because their claims have not yet accrued under the Alabama statute of limitations for asbestos-related claims in that neither Knipp nor Branyon has suffered a clinically diagnosable injury.[5] SBI argues that if Knipp and Branyon are allowed "to pursue this case to trial based on their `present' fear of developing an asbestos-related disease in the future, it would vastly change the current state of law in Alabama and open the door to a flood of litigation regarding `fear of injury' claims based solely on speculation and conjecture."
On appeal, Knipp and Branyon argue that their claims have accrued. They argue that their present injury is the mental anguish and emotional distress they have suffered as a result of SBI's conduct. They further state: "Once [Knipp and Branyon] discovered they had been lied to and exposed to asbestos they were injured in that they immediately suffered mental anguish and emotional distress."
The trial court denied SBI's motion for a summary judgment insofar as that motion was premised on the allegation of "fraudulent and wanton behavior," and Knipp and Branyon's brief to this Court argues that their alleged injuries arose from SBI's misrepresentation. In Boswell v. Liberty National Life Insurance Co., 643 So.2d 580, 581 (Ala.1994), this Court stated:
"To support a claim alleging suppression of a material fact, a plaintiff must show: (1) that the defendant suppressed a material fact, (2) that the defendant had a duty to communicate that material *716 fact, either because of a confidential relationship between the parties, or because of the particular circumstances of the case, and (3) that the plaintiff suffered actual injury as a result of the suppression. § 6-5-102, Ala.Code 1975; Crowder [v. Memory Hill Gardens, Inc., 516 So.2d 602 (Ala.1987)]; Chapman v. Rivers Construction Co., 284 Ala. 633, 227 So.2d 403 (1969)."
(Emphasis added.) This Court has also stated:
"`... "[F]raud, without damage, or damage, without fraud, gives no cause of action; but, where these two do occur, there an action lieth." Einstein, Hirsch & Co. v. Marshall & Conley, 58 Ala. 153, 160 [1877]; Wall v. Graham, 192 Ala. 396, 399, 68 So. 298, 299 [1915].
"`... "Deceit and injury must concur.... Damage is of the essence of the action of deceit; an essential element to the right of action, and not merely a consequence flowing from it." Wall v. Graham, supra.'"
Pihakis v. Cottrell, 286 Ala. 579, 583, 243 So.2d 685, 688 (1971), quoted in Boswell v. Liberty Nat'l Life Ins. Co., 643 So.2d at 581; Ford Motor Co. v. Rice, 726 So.2d 626, 627 (Ala.1998).[6]
Alabama has long required a manifest, present injury before a plaintiff may recover in tort.[7]Hinton v. Monsanto Co., 813 So.2d 827, 829 (Ala.2001); see also DeArman v. Liberty Nat'l Ins. Co., 786 So.2d 1090 (Ala.2000); Stringfellow v. State Farm Life Ins. Co., 743 So.2d 439 (Ala.1999); Williamson v. Indianapolis Life Ins. Co., 741 So.2d 1057 (Ala.1999); Ford Motor Co. v. Rice, supra; Pfizer, Inc. v. Farsian, 682 So.2d 405 (Ala.1996). The plaintiff in Hinton did not allege that he sustained a physical injury or an illness as a result of his exposure to polychlorinated biphenyls ("PCBs"); instead, he sought to recover the cost of medical monitoring he *717 alleged was made necessary by his exposure to PCBs. 813 So.2d at 828. In Hinton, a plurality of this Court held that Alabama law provides no redress for a plaintiff who has suffered no present injury or illness. 813 So.2d at 831-32.
In Pfizer, Farsian sued Pfizer, Inc., the manufacturer of a heart-valve implant, alleging that by not revealing to Farsian certain risks and defects, Pfizer had fraudulently induced him to receive a Bjork-Shiley heart-valve implant. 682 So.2d at 406. The Court determined:
"Regardless of how Farsian pleads his claim, his claim is in substance a product liability/personal-injury claimFarsian seeks damages because of the risk that his heart valve may one day fail....
"Under Alabama law, Farsian's fear that his valve could fail in the future is not, without more, a legal injury sufficient to support his claim. Although the facts as presented by the Court of Appeals indicate that the Bjork-Shiley heart valve has experienced problems with strut failures, Farsian's concern that his heart valve, which is presently functioning normally, could later malfunction is not an injury recognized by Alabama law."
682 So.2d at 407.
Dictum in Thomas v. BSE Industrial Contractors, Inc., 624 So.2d 1041 (Ala. 1993), is arguably to the contrary. Joel Thomas sued BSE Industrial Contractors, Inc., alleging that BSE had exposed him to unacceptable levels of risk by requiring him to work near insulation it knew contained asbestos, without warning him of the presence of the asbestos. 624 So.2d at 1043. Thomas argued that, given the amount of medical evidence available concerning the harmful effects of asbestos, the actions of the defendant constituted "extreme and outrageous" conduct. 624 So.2d at 1044. The Court noted that the tort of outrage is a very limited cause of action, available only in the most egregious circumstances, and it concluded that Thomas's testimony did not indicate the severe emotional distress this Court has required before holding that an outrage claim may be presented to the jury. 624 So.2d at 1045.
This Court did not address Thomas's proposition "that `cancerphobia' can constitute emotional distress in asbestos cases, even in the absence of present emotional problems." Thomas, 624 So.2d at 1046, discussing Jackson v. Johns-Manville Sales Corp., 781 F.2d 394 (5th Cir.1986). The Court did state, however:
"This Court has no quarrel with the proposition that the fear of cancer may constitute legally cognizable emotional distress in an appropriate case. However, Jackson [v. Johns-Manville Sales Corp., 781 F.2d 394 (5th Cir.1986),] is inapposite to this situation, because the Jackson plaintiff already had a physical diseaseasbestosisand he presented overwhelming evidence, in the form of expert medical testimony, that he was in fact likely to contract cancer from his exposure to asbestos."
Thomas, 624 So.2d at 1046 (emphasis added).[8]
Although Knipp and Branyon claim mental anguish and emotional distress based on SBI's alleged fraudulent conduct, Knipp testified in his deposition that he has not sought any medical care for his alleged emotional distress and he did not *718 plan to have any psychiatric or psychological treatment or any counseling for emotional distress or mental anguish.[9] When asked whether he had complained to any medical-care provider about anxiety with respect to his alleged asbestos exposure, Knipp answered "no." He further testified that he did not ask any medical providers for assistance or medication to help him sleep and that he had not taken any over-the-counter medications to help him sleep.
While fear is a real phenomenon and can be debilitating, based on the evidence presented in this case we conclude that Knipp and Branyon have not suffered any legally cognizable present injury.[10] Opening the courts generally for compensation for fear of future disease would be a dramatic change in the law and could engender significant unforeseen and unforeseeable consequences; awarding such compensation is better left to the Legislature. This Court, in Hinton, asked, "How would such a drastic departure from our traditional tort law requiring a manifest, present injury impact the laws of this State? What other areas of the law would also be affected by such a development? What would be the impact upon our statutes of limitation and the legal doctrines that have developed to guide the courts in the application of these statutes?" 813 So.2d at 830. Knipp and Branyon's cause of action has not accrued. They have not proven that they suffered from mental anguish or emotional distress as a result of SBI's conduct. Therefore, SBI's motion for a summary judgment on that basis should have been granted. The trial court's order insofar as it denied SBI's summary-judgment motion is reversed and the cause remanded for the entry of an order consistent with this opinion.
REVERSED AND REMANDED.
MOORE, C.J., and HOUSTON, BROWN, and STUART, JJ., concur.
HARWOOD, J., concurs specially.
LYONS, JOHNSTONE, and WOODALL, JJ., dissent.
HARWOOD, Justice (concurring specially).
I concur specially. Because this is a permissive appeal from an order denying a summary judgment, our review is de novo. Lightwave Techs., LLC v. Escambia County, 804 So.2d 176, 178 (Ala.2001); Verchot v. General Motors Corp., 812 So.2d 296, 299 (Ala.2001); and Ex parte Union Camp Corp., 816 So.2d 1039, 1042 (Ala.2001). Thus, using the same standard as the trial judge used to determine whether the evidence before him made out a genuine issue of material fact, we independently resolve that issue for ourselves. Id. Moreover,
"`[i]f the burden of proof at trial is on the nonmovant [for summary judgment], the movant may satisfy the Rule 56 [Ala. R. Civ. P.] burden of production either by submitting affirmative evidence that negates an essential element in the nonmovant's claim or, assuming discovery has been completed, by demonstrating to the trial court that the nonmovant's evidence is insufficient to establish an *719 essential element of the nonmovant's claim.'"
Ex parte General Motors Corp., 769 So.2d 903, 909 (Ala.1999)(quoting Berner v. Caldwell, 543 So.2d 686, 691 (Ala.1989) (Houston, J., concurring specially)); and Verchot, supra, 812 So.2d at 300. Stated another way, "[w]hen the basis of a summary-judgment motion is a failure of the nonmovant's evidence, the movant's burden... is limited to informing the court of the basis of its motionthat is, the moving party must indicate where the nonmoving party's case suffers an evidentiary failure." Rector v. Better Houses, Inc., 820 So.2d 75, 80 (Ala.2001). "The moving party must support its motion with sufficient evidence only if that party has the burden of proof at trial." 820 So.2d at 80. "When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue." Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997).
To support either a claim of fraudulent misrepresentation or a claim of suppression of material fact, a plaintiff must show, among other elements, "that actual injury" resulted from the plaintiff's reliance on either the misrepresentation or the suppression. Boswell v. Liberty Nat'l Life Ins. Co., 643 So.2d 580, 581 (Ala.1994). It is that element of Knipp and Branyon's claim that SBI contends the materials submitted with its summary-judgment motion demonstrated to be without evidentiary support, at least on a prima facie basis, and it is that element that Knipp and Branyon in their submissions failed to establish by substantial evidence.
The only evidence relating to possible present injury was, (1) as noted in the trial court's order, which is set out in Justice Woodall's dissent, "Knipp testified [by deposition] that during the removal of the oven, he coughed up blood and had a chronic cough"; and (2) the deposition testimony of Knipp and Branyon's expert, Dr. John Allen Dicks Cooper, Jr., a pulmonologist. Other than mentioning in its order that during the removal of the oven Knipp had coughed up blood and had had a chronic cough, the trial court made no further reference to those circumstances; it certainly never suggested that those events had in any way been linked to Knipp's exposure to asbestos. Nowhere in any of the submissions to the trial court did Knipp contend that his alleged coughing up blood and chronic cough during the time he as removing the oven were somehow caused by his exposure to asbestos, and in his brief to this Court he has not made any such contention. Dr. Cooper explained that, concerning any "respiratory bronchitis" Knipp might have experienced during his exposure to the asbestos, "it sounds like it was a very dusty environment and that would not necessarily be the asbestos that was causing [the coughing up of blood and the chronic cough]," and "I can't say it was the asbestos particles or just other dust particles in there that did that." Thus, the only "actual," present damage Knipp and David Branyon assert in their brief to this Court that they have suffered is that "[o]nce the plaintiffs discovered that they had been lied to and exposed to asbestos, they were injured in that they immediately suffered mental anguish and emotional distress." They explain that their mental anguish and emotional distress arose out of their fear that they may eventually develop some form of cancer. In that regard, they rely on this proposition, as expressed in their brief:
"The Plaintiffs' expert, Dr. Allan [Allen] Cooper, has testified that, based on epidemiological studies, Ray Knipp has `a two hundred, three hundred percent increased chance' of developing lung cancer *720 and mesothelioma due to his exposure to asbestos at the Tatum Bakers' facilities. Furthermore, Dr. Cooper is of the opinion that David Branyon's risk of developing lung cancer and mesothelioma could be higher or lower than Ray Knipp's risk based upon individual susceptibility."
(Appellee's brief, pp. 4-5.)
Justice Woodall accepts this notion of significantly increased risk in his dissent, where he states, "[Knipp and Branyon's] expert witness testified that individuals, such as Knipp and Branyon, who are exposed to asbestos for less than one month, face a `252 percent increase in the risk of lung cancer.'" 852 So.2d at 729. For my part, had the increased risks to Knipp and Branyon for developing lung cancer and/or mesothelioma from their asbestos exposure of only several weeks duration been translated into concrete, "absolute" terms, I would be more receptive to the idea that an actual, present injury had occurred. (Knipp testified that his exposure to asbestos occurred during the "different days we worked different hours for about three weeks," and Branyon testified that he was on the job for "12, 13 days.")
Dr. Cooper's deposition was presented to the trial court in a piecemeal fashion. That is to say, 15 pages of his deposition were submitted by SBI as an exhibit to its motion for a summary judgment as to the claims of Knipp; 11 pages were submitted as an exhibit to SBI's motion for a summary judgment as to the claims of Branyon (8 of those pages duplicated pages already submitted in connection with the motion as to Knipp); and 3 pages, none of which had been included in the earlier submissions, were attached as exhibits to "Plaintiffs' Brief in Opposition to Defendant's Motion for Summary Judgment." Thus, 21 pages from Dr. Cooper's deposition were before the trial court. Within them, Dr. Cooper testified that he had never examined either Knipp or Branyon and that he had not reviewed any medical records concerning either man, but that he had reviewed Knipp's deposition. He had consulted some articles by experts in the field of asbestos-related illnesses "and tried to glean out whether we could determine what the risk was for various disorders." Included in the submitted pages of Dr. Cooper's deposition[11] were the following questions and answers:
"Q. In looking at that, have you ever reviewed Seidman and Selikoff's 1972 article about this from the same plant?
"A. Yeah, I think I have. That may be in my file as well. This was the one that I think looked a little bit more into specific relative risk a little bit better, but
"Q. From that did you glean what the relative risk was for lung cancer among the workers at the Paterson amosite plant?
"A. What I got out of this from the table says yes, that they broke them down into length of exposure to asbestos and looked at the relative risk for lung cancer, all cancers, *721 all causes of death. And so that's one reason why I brought this in, yes.
"Q. Did they give any data for individuals whose exposure was for a period of time less than one month?
"A. They do have here 61 subjects who had less than one month exposure.
"Q. From that data do you know whator is it broken out so that we know what they found to be the relative risk for lung cancer for those
"A. Out of those
"Q. sixty-one people?
"A. Yes. Out of those 61, at the 39 year period, they had expected 2.38 lung cancers and found 6. So, they felt that there was a 252 percent increase in the risk of lung cancer at that time. So, that's taking all of the years from 5 to 39 years. So, they did start seeing maybe some increased risk at 29 years.[12]
"Q. Twenty-nine years post exposure?
"A. Right, which is kind of classic for asbestos."
Dr. Cooper's expression of the degree of increase in the risk of lung cancer following a less than one-month exposure, as "252 percent," can readily be confirmed and better understood, by taking the figures he cited2.38 expected lung cancers versus 6 actually foundand applying "reverse math." Multiplying 2.38, the expected number of cancers, by 2.52, the degree of increase over that number, results in a figure of 5.9976. "Rounding" that figure results in the figure six quoted by Dr. Cooper. When subsequently asked "what is your opinion concerning Mr. Knipp's risk of developing an asbestos related cancer," Dr. Cooper replied, "I would say that from that one article that maybe he has a 200, 300 percent increased chance or two to threefold increased chance after 29 years. Twenty-four years is probably a littleyou know, would be kind of the edge of when he would start seeing it."
Although not included as one of the attachments to the submissions supporting and opposing the summary-judgment motions, there appears in the record a copy of a letter from Dr. Cooper to Knipp and Branyon's counsel on September 29, 2000; that letter reads:
"I am sorry for the delay in this response but I wanted to get the best estimate of your client's risk. I am enclosing two articles dealing with the risk of various problems after asbestos exposure. Probably the one that addresses the problem the best is that by Seidman and colleagues. This article demonstrates a significant increase in chance of death due to lung cancer, mesothelioma or other causes of subjection, such as Mr. Knipp, who were exposed to increased doses of asbestos for 1 to 2 months. Table IX of this article demonstrates that beginning 29 years after exposure for 2 months subjects have more than twofold increase in chance of death due to all asbestos diseases [sic]. Table VI shows an even higher risk for developing some sort of cancer (up to fourfold increase) after 29 years.

*722 "I think these articles demonstrate conclusively that your client was placed in a potentially damaging situation when he was not told that the work he was to perform would expose him to asbestos. I believe this exposure placed him at increased risk for lung cancer and mesothelioma, and to a lesser degree asbestosis. These problems may not manifest themselves for more than 29 years. I would be happy to answer any other questions regarding this case."
I consider this letter only as confirmation of my understanding that Dr. Cooper's deposition reference to a "252 percent increase" and his more generalized deposition reference to "a 200, 300 percent increased chance or two- to three-fold increased chance after 29 years," express a magnitude of approximately two and one-half times whatever the normal risk would be. That is further confirmed by the following testimony, which appears on page 38 of his deposition:
"A.... [N]onsmoking, but overall I guess you could use this expectedit's probably something like 5, 10 out of 100,000. So, it's not thatit's not that common, butit's probablyI can't give you a number. I'm not 
"Q. Not a precise number
"A. Yeah.
"Q. but ballpark, maybe somewhere 5 to 10 out of 100,000
"A. Yeah, that's probably low actually.
"Q. individuals?
"A. So, I can't really give you a definite number there.
"Q. And with this exposure, it would roughly be 2.5 times whatever that is

"A. Yeah.

"Q. five to ten?
"A. I mean, their numbers are calculated. The expected are calculated...."
(Emphasis supplied.) Unfortunately, the exact context and meaning of the first part of this testimony is unclear because the pages of Dr. Cooper's deposition "closest" to it that appear in the record are 36 and 45. Pages 37 and 39, which would have provided the testimony immediately before and after the testimony appearing on page 38, are not in the record. Therefore, the circumstances under which there might be "5, 10 out of 100,000" is unknown. Nonetheless, it is instructive that the attorney phrased his final question so that, with regard "to this exposure," he expressed his understanding that "it would be roughly 2.5 times whatever that is," and Dr. Cooper responded so as to confirm that that multiplier would be appropriate. When Dr. Cooper was questioned as to whether Branyon's relative risk of developing a lung cancer or mesothelioma in his lifetime would be less than that of Knipp, "if he had less exposure, for example, worked fewer days in the conditions that Knipp described," Dr. Cooper explained that there might be "some very unlucky individuals" who have an individual susceptibility that might put them at increased risk, but in the absence of being able to "take [Branyon's] genes and find that he was a susceptible individual," he "would not be able to say whether there was a difference or not."
Thus, once the portions of Dr. Cooper's deposition available for consideration by the trial court and by this Court on de novo review are carefully read, we see that Dr. Cooper has opined only that Knipp and Branyon's risk of contracting an asbestos-related cancer has increased 2.52 times. The critical issue then becomes, what was that risk to start with? Unfortunately, that figure is never stated and, without it to multiply by 2.52, I cannot derive the *723 actual increased risk, and I have no basis for concluding that the risk for Knipp and Branyon as thus elevated is of such size as to warrant legal recognition of their concern about it as an actual, present damage. If, for example, the "5, 10 out of 100,000" figure referenced in Dr. Cooper's testimony had some application to Knipp and Branyon's situation, then Dr. Cooper's agreement that "2.5 times whatever that is" would represent the resulting risk, and would translate to an absolute risk of only 12.5 to 25 persons out of every 100,000. Such a minimal risk range, representing at its maximum only one out of every 4,000 persons, would not, to my mind, represent the quantum of risk about which concern could qualify as a present, actual damage, particularly when it would not materialize, for 29 or perhaps 24 years.
At the other extreme, hypothetically, if a particular risk statistically exposed 2 out of every 10 persons, then a 2.52 increase in that risk would subject 5.04 persons out of every group of 10, representing an absolute risk of more than 50%. Dr. Cooper acknowledged that Knipp, and also Branyon, "if he got the same exposure," would not be likely to develop cancer from their asbestos exposure, i.e., they would not be more likely than not to develop it. As it stands, we are left simply to speculate about what might be the actual, present risk to either Knipp or Branyon as a result of their exposure to asbestos. We know only that it is between two and three times their normal risk. As noted earlier, Knipp and Branyon have the burden of proving, as an essential element of a prima facie case of either fraudulent misrepresentation or suppression of a material fact, that actual injury has occurred. They note in their brief to this Court that "the parties have conducted extensive discovery and have fully engaged the litigation process" and that the case "was set for trial and the parties were prepared to try this case during the week of August 26, 2001," but SBI filed its motions for a summary judgment on August 13, 2001, and the case was continued.
Under those circumstances, the principle earlier quoted from Ex parte General Motors Corp., supra, applies, as thus paraphrased. In a case where "discovery has been completed," the defendant may satisfy its Rule 56, Ala. R. Civ. P., burden of production either by submitting affirmative evidence that negates an essential element in the plaintiff's claim, because the plaintiff would have the burden of proof at trial, or by demonstrating that the plaintiff's evidence is insufficient to establish that essential element. In such a circumstance, the plaintiff may counter, so as to defeat the motion, "`by directing the trial court's attention to evidence of that essential element already in the record, that was ignored or overlooked by the movant, or may submit an affidavit requesting additional time for discovery....'" Ex parte General Motors Corp., supra, 769 So.2d at 909 (quoting Berner v. Caldwell, 543 So.2d 686 (Ala.1989)(Houston, J., concurring specially)). If the plaintiff "cannot produce sufficient evidence to prove each element of its claim, the [defendant] is entitled to a summary judgment, for a trial would be useless." Id.
Using the phrasing used by this Court in dictum in Thomas v. BSE Indus. Contractors, Inc., 624 So.2d 1041, 1046 (Ala. 1993), I have "no quarrel with the proposition that the fear of cancer may constitute legally cognizable emotional distress in an appropriate case." In that regard, the Thomas Court pointed out that in the case cited by the plaintiff "as support for the proposition that `cancerphobia' can constitute emotional distress in asbestos cases, even in the absence of present emotional problems," Jackson v. Johns-Manville Sales Corp., 781 F.2d 394 (5th Cir.1986), *724 the party asserting the injury had presented "overwhelming evidence, in the form of expert medical testimony, that he was in fact likely to contract cancer from his exposure to asbestos" (emphasis supplied).
This Court further noted in Thomas that in Jackson the United States Court of Appeals for the Fifth Circuit "expressly declined to decide whether the fear of cancer could constitute a compensable injury where the plaintiff is unable to demonstrate that he is likely to contract cancer." 624 So.2d at 1046. Knipp and Branyon have not shown that they are likely to contract cancer from their exposure to asbestos, because they have made a showing only that whatever their normal risk of contracting cancer might have been, it is now 2.52 times greater. Whether that translates to 2.52 chances out of a hundred, 25.22 chances out of a hundred, 50 chances out of a hundred, etc., is not established anywhere in the record.
Justice Woodall's dissent contains the statements:
"`Emotional distress is compensable in a fraud action. See, e.g., First Commercial Bank v. Spivey, 694 So.2d 1316 (Ala.1997).' Spooner v. State Farm Mut. Ins. Co., 709 So.2d 1157, 1161 (Ala. 1997) (emphasis added). This is so, even where the claims for emotional distress are based on mere `uncertainty' as to the likelihood of economic loss eventually resulting from the fraud. 709 So.2d at 1161."
852 So.2d at 728.
In First Commercial Bank v. Spivey, 694 So.2d 1316 (Ala.1997), there was nothing uncertain about the damages suffered by Sheryl Spivey. The jury verdict in her favor included $500,000 in compensatory damages; this Court concluded that "most of the compensatory damages award, perhaps as much as $450,000, could have been composed of damages for emotional distress," 694 So.2d at 1326, that Spivey experienced after she and her husband, "lost their real property, including their old house, the new one under construction, and approximately 21 acres of land" as a result of the defendant's fraudulent conduct. During that time, "the Spiveys were under pressure by creditors and Sheryl Spivey was required to go back to work to help support her husband and three children." 694 So.2d at 1320. Ms. Spivey produced ample evidence of her resulting humiliation, embarrassment, emotional and mental distress, and problems imposed upon the parties' marriage.
A careful reading of that case reveals that the defendant never contended that Ms. Spivey's mental and emotional distress could not represent an actual, present injury. Rather, among the five issues it presented on appeal, only two were even somewhat related to such a contention. First, the defendant argued that Sheryl Spivey had failed "to present sufficient evidence to allow the jury to reasonably conclude that [the defendant's] actions had proximately caused the financial loses and emotional distress she alleged." Second, the defendant asserted that the trial court erred in refusing to reduce the $500,000 compensatory-damages award. As to the first issue, this Court agreed with the defendant that there was evidence indicating that the Spiveys might have mismanaged their personal finances and thereby contributed to their financial plight, but pointed out that the record otherwise contained evidence that, "when viewed in the light most favorable to Sheryl Spivey, [was] sufficient to allow the jury to find that [the defendant's] actions had set in motion the chain of events that ultimately led to the damage she claimed." 694 So.2d at 1320. As to whether the compensatory-damages award should have been reduced, this *725 Court concluded that there was evidence showing that, as a result of the defendant's fraudulent conduct, Sheryl Spivey had lost "the primary source of income for her and her family, as well as her equity interest in the Spiveys' two houses and the land on which they were constructed"; that their old house and the 21 acres of land were valued at approximately $117,000; and that Sheryl Spivey had been "humiliated and embarrassed as a result of the family's financial problems, which eventually led to the Spiveys' filing a personal bankruptcy petition." 694 So.2d at 1325.
Thus, although the Spivey Court upheld the compensatory-damages award in response to the two challenges made by the defendant, the Court was not called upon to make any ruling about the availability in a fraud action of damages for emotional distress. This point is not made to suggest that emotional distress is not properly compensable in a fraud action; rather, it is made simply to make clear what issues were actually addressed in Spivey. The mental damage and emotional distress suffered by Ms. Spivey were clearly proximately caused by the defendant's fraudulent conduct, because they clearly arose from other substantial damage and injury presently and actually caused by that conduct.
In short, there was nothing speculative, remote, or uncertain about the nature of the circumstances that caused Sheryl Spivey's mental anguish and emotional distress. Thus, when this Court subsequently stated in Spooner, supra, that "[e]motional distress is compensable in a fraud action. See, e.g., First Commercial Bank v. Spivey, 694 So.2d 1316 (Ala. 1997)," 709 So.2d at 1161, it was simply stating a generic proposition and was simply citing to a fraud action in which compensatory damages for emotional distress had been upheld as against the only two challenges made to them in that case. Nonetheless, I do not question that damages for mental anguish and emotional distress may properly be awarded a victim of fraud where sufficiently linked to other, legally cognizable injury.
Also, as noted, I am open to the proposition that "the fear of cancer may constitute legally cognizable emotional distress in an appropriate case." Thomas, 624 So.2d at 1046. I simply conclude that in this case, given the "gap" in Knipp and Branyon's prima facie case for each of their claims, caused by their failure to prove their resulting level of risk of cancer, we cannot gauge the reasonableness of any concern about that degree of risk. As a consequence, Knipp and Branyon have failed to prove "actual injury." I would qualify Justice Woodall's conclusion that the lesson to be drawn from Spooner is that "the worry causing occurrence need not be certain to materialize." 852 So.2d at 728. To my understanding of the facts set forth in Spooner, the worry-causing occurrence had in fact materialized. Ms. Spooner, relying on the representations of the insurance adjuster who represented the insurer who covered both her and the adverse motorist, signed a general release in favor of the other motorist as to all damage she had suffered. There was no dispute about the fact that the other motorist was at fault in the collision, and the insurance adjuster assured Ms. Spooner by multiple statements that the release she was signing covered only the property damage to her vehicle. Ms. Spooner had emphasized to the adjuster that "`I'm still having problems, I'm still going to the doctor'" and had received his unequivocal assurance that the release she was signing would not affect anything other than the property-damage claim. 709 So.2d at 1159. The adjuster also told her that she had three years from the date of the accident to make a claim against the other *726 motorist. Subsequently, however, in a conversation she had with the adjuster, he told her "that she had released [the other motorist] from all liability `a long time ago.'" 709 So.2d at 1159. She also learned that a two-year statute of limitations applied to her claim against the other motorist. The adjuster had never told her about that shorter limitations period, but this Court determined that he "was under a legal duty to make this material disclosure," 709 So.2d at 1161, because the insurer was in "a fiduciary relationship with its insureds." 709 So.2d at 1158. Thus, as far as Ms. Spooner understood the situation, she had totally lost her right to recover any further damages. Therefore, a "worry-causing occurrence" had actually and presently transpired, and her emotional distress, resulting from the situation in which she found herself, related to a present reality, not a speculative future possibility.
Accordingly, I concur in the majority opinion for the reasons expressed above, some of which may be in addition to those stated in the majority opinion, but none of which are inconsistent with its rationale.
WOODALL, Justice (dissenting).
I would affirm the order of the trial court denying in part SBI's summary judgment motions. Therefore, I respectfully dissent.
The complaint filed by Knipp and Branyon charged SBI with, among other things, various species of fraud, in connection with an agreement, pursuant to which Knipp and Branyon removed an oven from the premises of "Tatum Bakers, Inc.," alleged to be a "subdivision" of SBI. The plaintiffs' allegations are summarized in the order denying SBI's summary-judgment motions:
"Knipp, through his employer, [and with the aid of Branyon,] was hired to remove [old baking equipment] from the Tatum Bakers facility to be shipped to Jamaica. They were also to install a new oven for Tatum Bakers. After discussions with certain individuals a concern was raised by Knipp as to whether or not the old oven [contained] asbestos. Knipp claimed that he had specific discussions with Ray Downey, who is president of Tatum Bakers, regarding removal of the old oven and specifically inquired as to whether or not an environmental study had been performed on the oven; and discussed whether a study would show that the oven was toxin free. The plaintiff contends that Downey in response to inquiries by Knipp showed Knipp documents that indicated the oven was free of asbestos. Following further information Knipp received, he took samples that he removed from the insulation of the old oven and had them tested, and found that the oven insulation [contained] very substantial amounts of asbestos. Knipp claims that Downey admitted that the report that he gave him was inaccurate regarding whether or not the oven contained asbestos. Knipp further claimed that Downey changed his story and testified that he gave Ray Knipp a single page document that showed that the oven did contain asbestos. Among the allegations made by Knipp and ... Branyon was that they were subjected to exposure to asbestos.... Knipp says that based on the assurance that the insulation did not contain asbestos, that [the insulation] was dumped in the Jefferson County Landfill which is in violation of many government regulations prohibiting such removal and dumping. Knipp testified that during the removal of the oven, he coughed up blood and had a chronic cough. As a result of the alleged wrongdoing of [SBI], [Knipp and Branyon] were caused to suffer *727 great emotional damage and the fear of developing mesothelioma, a rare cancer of the lining of the lungs that is primarily associated with exposure to asbestos. [Knipp and Branyon's] primary concerns are the claimed emotional damages as a result of the fraudulent and wanton behavior of [SBI] and the fear that at some time in the future they will develop lung cancer or other health problems.
"On August 14, 2001, [SBI] filed a motion for summary judgment against each plaintiff. The primary basis for each motion for summary judgment is that each Plaintiff has failed to provide any evidence of a physical manifestation of injury from his alleged asbestos exposure and each Plaintiff has failed to provide any evidence that he is more likely than not going to contract an asbestos related disease from his exposure to asbestos.... [SBI] contends that if there is no physical manifestation of injury or other evidence indicating that the plaintiff has a more than even chance of developing an injury, then the plaintiff is not entitled to recover. [SBI] states that [Knipp and Branyon's] expert['s] opinion is that, based on the exposure of less than a month, the risk beginning twenty-nine (29) years after exposure would be 2.5 times the normal risk of developing lung cancer. [Knipp an Branyon's] concern is that [they have] emotional damage now and the problem of the sword of Damocles hanging over [their heads] for the next twenty-nine (29) years not knowing whether or not [they] will have cancer of the lung. There is also a concern that if [they have] to wait there is no guarantee that [SBI] will be around to bring an action against even if [they] can otherwise satisfy the requirements of the Code of Alabama, Section 6-2-30, and other statutes of limitations. If, as [Knipp and Branyon have] stated, the agent of [SBI] knew and falsified or misled [Knipp and Branyon] about the presence of asbestos, there is, indeed, a serious accusation that is worthy of inquiry by the appropriate authorities....
"... Considering the submissions of the parties, this court finds that to the extent that [Knipp and Branyon's] causes of action arise from present damage, [SBI's] motions for summary judgment are overruled.
"In the court's opinion, this ... order denying [SBI's] motions for summary judgment ... involves a controlling question of law as to which there is a substantial ground for difference of opinion, that an immediate appeal from this ... order would materially advance the ultimate termination of the litigation and that the appeal would avoid protracted and expensive litigation."
As the trial court noted, the complaint, as last amended, contained counts alleging (1) negligent or wanton failure to warn the plaintiffs that the oven contained asbestos; (2) fraudulent suppression; (3) negligent, reckless, or intentional misrepresentation; and (4) negligent or wanton failure to train and supervise SBI's employees, namely, Ray Downey. In each count, Knipp and Branyon sought compensation for "extreme emotional distress and mental anguish," on the ground that they "are at a greater risk of developing lung cancer and other diseases of the lungs in the future."
This appeal, and the order from which it comes, focuses on the fraud aspect of the case. More specifically, Knipp and Branyon state: "Once [they] discovered they had been lied to and exposed to asbestos they were injured in that they immediately suffered mental anguish and emotional distress." Appellees' Brief, at 9 (emphasis added). Thus, the specific question this *728 Court should address is whether a plaintiff who is fraudulently induced to expose himself or herself to asbestos may recover for emotional distress, namely, worry, arising out of his discovery of the fraud, coupled with the increased risk, as established by expert testimony, that the plaintiff will eventually contract cancer as the result of the exposure. This Court should answer that question in the affirmative.
"Emotional distress is compensable in a fraud action. See, e.g., First Commercial Bank v. Spivey, 694 So.2d 1316 (Ala. 1997)." Spooner v. State Farm Mut. Auto. Ins. Co., 709 So.2d 1157, 1161 (Ala.1997) (emphasis added). This is so, even where the claims for emotional distress are based on mere "uncertainty" as to the likelihood of economic loss eventually resulting from the fraud. 709 So.2d at 1161.
Spooner arose out of an automobile accident that occurred on August 30, 1990, involving Yvonne Spooner and Dr. Laurence T. Zottoli, Jr. 709 So.2d at 1158. Both Spooner and Zottoli were insured by State Farm Mutual Automobile Insurance Company ("State Farm"). On October 12, 1990, State Farm paid Spooner for the damage she had incurred, including medical bills, pain and suffering, and repairs to her automobile. Id. In connection with that payment, State Farm obtained from Spooner a "general release." Id. In subsequent discussions with State Farm's claims adjuster, Spooner learned for the first time that the document she had signed released Zottoli from all liability, not, as she had thought, merely from liability for property damage. 709 So.2d at 1159.
Subsequently, she sued Zottoli for "negligence and wantonness in connection with the accident." 709 So.2d at 1160. She also sued State Farm for fraud, alleging that the claims adjuster misrepresented, among other things, the true nature of the release she had signed. Id. State Farm never asserted the general release as an affirmative defense, and Spooner's claims against Zottoli were settled. Id.
From State Farm, Spooner sought compensation for emotional distress, as a result of the uncertainty created by the existence of the general release, and the fear that State Farm might assert it as a defense to her claims against Zottoli. 709 So.2d at 1160-61. The trial court entered a summary judgment in favor of State Farm; Spooner appealed. 709 So.2d at 1157. On appeal, State Farm argued that Spooner suffered no injury as a result of the alleged fraud because it never, in fact, raised the affirmative defense, and that, as a consequence, Spooner was successful in settling her claims against Zottoli. 709 So.2d at 1161.
Disagreeing with State Farm, this Court reversed the summary judgment. It held that Spooner was entitled to recover damages for the emotional distress she suffered "from the time that she was informed that she had signed a general release... until State Farm waived the defense[] of the release." 709 So.2d at 1161. The Court explained that "`once a fraud has been committed, the perpetrator cannot "take it back" or cover it up by his subsequent actions.... Once a fraud has been accomplished, subsequent actions cannot completely erase the injury done to the person against whom the fraud was committed.'" 709 So.2d at 1161 (quoting Boswell v. Liberty Nat'l Life Ins. Co., 643 So.2d 580, 584 (Ala.1994)).
This case is analogous to Spooner in that SBI contends that Knipp and Branyon's fear of eventually developing cancer as a result of the alleged fraud may never and, in fact, probably will notmaterialize. As Spooner teaches, however, the worry-causing occurrence need not be certain to materialize. Indeed, it is sufficient for recovery that the increased risk of *729 occurrence provides a rational basis for the plaintiff's worry. Just as Spooner was legally entitled to recover for emotional distress she suffered during the time she had a legitimate concern about the possible effect of the general release on her claims against Zottoli, Knipp and Branyon are entitled to recover for any emotional distress they suffer, based on the unrefuted testimony of their increased risk of an occurrence of cancer. The majority disagrees, focusing on the absence of any medical treatment for emotional distress. Our fraud jurisprudence does not condition recovery for emotional distress or mental anguish upon having sought treatment for those conditions. Instead, the absence of medical treatment is merely a factor the jury may consider in assessing the amounts necessary to fairly and reasonably compensate a plaintiff.
This conclusion is not inconsistent with the cases relied upon by the majority, namely, Hinton v. Monsanto Co., 813 So.2d 827 (Ala.2001); Pfizer, Inc. v. Farsian, 682 So.2d 405 (Ala.1996); and Thomas v. BSE Industrial Contractors, Inc., 624 So.2d 1041 (Ala.1993). In Hinton, a plurality of this Court answered in the negative a certified question asking whether "a complaint which does not allege any past or present personal injury to the plaintiff state[s] a cause of action for medical monitoring and study when the plaintiff alleges that he has been exposed to hazardous contamination and pollution by the conduct of the defendant." 813 So.2d at 828 (emphasis added). The complaint in this case, by contrast, clearly alleges a present injury as a result of fraud.
In Farsian, this Court held that the plaintiff, the recipient of a "Bjork-Shirley heart valve implant," 682 So.2d at 406, which had never malfunctioned, but which, at the time of the appeal, was working properly, could "not maintain a fraud claim under Alabama law." 682 So.2d at 407 (emphasis added). Although the plaintiff cast his allegations in terms of fraud, this Court construed "his claim [to be] in substance a product liability/personal-injury claim." 682 So.2d at 407 (emphasis added). The Court cited with approval opinions of other jurisdictions, holding that heart-valve recipients situated similarly to Farsian "could not recover for alleged mental distress absent proof that the valve was defective and absent any physical injury." 682 So.2d at 408. Although there was evidence indicating that some "Bjork-Shirley heart valve implants" had failed, there was no evidence that the specific valve received by Farsian was defective or that it was likely to fail. Id. at 406-07.
It is undisputed that the substance to which Knipp and Branyon have been exposed is neither safe nor benign. On the contrary, Knipp and Branyon were, as the result of SBI's alleged fraud, exposed to a toxic substance, creating a specific risk that is both identifiable and quantifiable. Their expert witness testified that individuals, such as Knipp and Branyon, who are exposed to asbestos for less than one month, face a "252 percent increase in the risk of lung cancer." This case is, therefore, distinguishable from Farsian.
This case is also distinguishable from Thomas. That case involved a claim by an employee against his employer alleging "outrageous conduct," based on an alleged failure "to warn him of the presence of asbestos-filled insulation in his work area." This Court held that the plaintiff's "generalized fear of cancer ... [did] not rise to *730 the level of `severe emotional distress' necessary to present a jury question on the tort of outrage." 624 So.2d at 1046 (emphasis added). Significantly, the Court also stated that it had "no quarrel with the proposition that the fear of cancer may constitute legally cognizable emotional distress in an appropriate case." 624 So.2d at 1046 (emphasis added). This is such a case.
For the above-stated reasons, the trial court did not err in denying SBI's summary-judgment motions insofar as they asserted causes of action that arose from "present damage." The order of the trial court should, therefore, be affirmed. I therefore dissent.
LYONS and JOHNSTONE, JJ., concur.
NOTES
[1] Tatum Bakers, Inc., is a division of Southern Bakeries, Inc.
[2] SBI filed two summary-judgment motions: one relating to Knipp's claims and one relating to Branyon's claims. Both motions were identical and we will treat them as one motion in this opinion.
[3] SBI noted that Dr. Cooper's opinion, based on Knipp's alleged exposure to asbestos of less than a month, is that the risk of developing lung cancer beginning 29 years after his alleged exposure would be 2.5 times the normal risk.
[4] The trial judge did not include a statement of the controlling question of law; however, SBI filed its request for permission to appeal before Rule 5(a), Ala. R.App. P., was amended, effective June 1, 2002, to require the trial judge to "include in the certification a statement of the controlling question of law." The parties framed the controlling question of law differently. Because, before its amendment, Rule 5, Ala. R.App. P., required only that the petitioner state the controlling question of law, it is appropriate to adopt the controlling question of law as framed by SBI. "The petition shall contain a statement of the facts necessary to an understanding of the controlling question of law determined by the order of the trial court; a statement of the question itself; and a statement of the reasons why a substantial basis exists for a difference of opinion on the question...." Rule 5(b), Ala. R.App. P., as it read before the amendment effective June 1, 2002.
[5] Section 6-2-30(b), Ala.Code 1975, provides:

"A civil action for any injury to the person or the rights of another resulting from exposure to asbestos, including asbestos-containing products, shall be deemed to accrue on the first date the injured party, through reasonable diligence, should have reason to discover the injury giving rise to such civil action...."
[6] The dissenting opinion recognizes that "`[e]motional distress is compensable in a fraud action.'" 852 So.2d at 728 (quoting Spooner v. State Farm Mut. Auto. Ins. Co., 709 So.2d 1157, 1161 (Ala.1997)). The dissenting opinion reasons that this case is analogous to Spooner because Knipp and Branyon's "fear of eventually developing cancer as a result of the alleged fraud may neverand, in fact, probably will notmaterialize. As Spooner teaches, however, the worry-causing occurrence need not be certain to materialize." 852 So.2d at 728. In Spooner, this Court stated that State Farm was under a legal duty to make certain material disclosures regarding Spooner's insurance policy. See State Farm Mut. Auto. Ins. Co. v. Ling, 348 So.2d 472 (Ala.1977)(holding that State Farm was under a fiduciary duty to disclose to the insured the statute of limitations that applied to his claim). This Court further stated that there was sufficient evidence tending to show that State Farm misrepresented the nature of the general release signed by Spooner and that Spooner relied on those misrepresentations. Spooner, 709 So.2d at 1161. State Farm argued that Spooner could not prove any compensable damage because it ultimately waived Spooner's statute of limitation; therefore, she was able to pursue her claim. This Court concluded that State Farm could not, merely by waiving its affirmative defenses, completely erase the emotional distress that Spooner claimed she suffered from the uncertainty surrounding her claims. Id. This case, however, is not analogous to Spooner; this case is not an insurer-insuree case, and SBI was not in a fiduciary relationship with Knipp and Branyon.
[7] It is a basic principle of tort law that in negligence cases, the plaintiff must suffer actual injury; the threat of future harm, not yet realized, is not enough. W. Page Keeton et al., The Law of Torts § 30 at 165 (5th ed.1984). However, in cases where the defendant acted intentionally, damages for mental disturbance, whether the disturbance results in physical injury, are more readily held to be recoverable. Keeton, § 8 at 37 n. 29. Traditionally, courts have been loathe to redress mental injuries because of the difficulty of proof or measurement of damages. Keeton, § 12 at 55.
[8] In Harco Drugs, Inc. v. Holloway, 669 So.2d 878, 881 (Ala.1995), this Court recognized that when a plaintiff who has been diagnosed with breast cancer does not receive the medicine prescribed for the treatment of her cancer, the misfilling of the prescription provides a reasonable basis for her emotional distress.
[9] Knipp and Branyon do claim that they "will be caused in the future to incur medical expense for medical monitoring of their health due to their exposure to asbestos"; however, as we note above, Alabama does not recognize a cause of action for medical monitoring. Hinton, 813 So.2d at 831.
[10] The plaintiffs in Harco Drugs and Jackson already suffered from a physical injury breast cancer and asbestosis, respectively.
[11] Although the certificate of completion of the clerk's record prepared by the circuit clerk of Jefferson County notes that "[a]ll original paginations were removed" and "all pages constituting the clerk's record are assembled chronologically in the order of their filing ... and all pages are numbered serially," which is entirely an appropriate procedure, the original page numbers of the deposition are still discernible through the white overlay used to obscure them, and fully apparent when held to the light; moreover, the references to particular deposition pages in the two motions for a summary judgment and in Knipp and Branyon's brief in opposition, are such that the original pagination of those pages as they appear in the record can be easily correlated.
[12] Dr. Cooper starts out referring to a "39 year period," and repeats that reference, but then begins referring to "29 years." As will be noted, he subsequently refers only to 29 years, and that is the time span the trial judge referenced twice in his order, attributing it in one instance to the expression by Knipp and Branyon of the basis of their "concern." SBI has referenced the 29-year figure throughout its brief, never alluding to any 39-year period, and Knipp and Branyon in their brief have talked simply in terms of increased risk, without referencing any particular period.