Pursuant to Rule 5, Ala. R. App. P., this Court granted Ford Motor Company ("Ford") permission to appeal from an interlocutory order holding that Ford was not entitled to a summary judgment on the fraudulent-suppression claims of the named plaintiffs in this putative class action brought on behalf of Alabama residents who owned Ford Bronco II sport utility vehicles. We reverse and remand.
The named plaintiffs, Mary Rice, Brent Puckett, and Sandra Giles, are owners of Bronco II sport utility vehicles, a model manufactured and marketed by Ford between 1983 and 1990. The plaintiffs alleged that *Page 627 
each Bronco II contains a design defect that causes it to have an undue propensity to roll over in sudden-avoidance maneuvers. The plaintiffs also asserted that, as a result of testing it had conducted, Ford was aware of the Bronco II's rollover propensity but had fraudulently suppressed that information in order to induce the plaintiffs to purchase their vehicles. No plaintiff alleged that his or her Bronco II had actually rolled over and thereby caused personal injuries or property damage. Instead, the plaintiffs maintained that they had been damaged by being induced to purchase vehicles that they say were worth less than they would have been worth if they had been what Ford had represented them to be. That is, the plaintiffs contended that they did not get what they bargained for, in that their vehicles, they said, contain a safety defect that Ford fraudulently failed to disclose, thereby suggesting that the vehicles did not possess such a flaw. The plaintiffs admitted that they could not point to any tangible adverse economic consequences flowing from the alleged defect, such as diminished resale value in comparison to similar vehicles. Notwithstanding the fact, the plaintiffs maintained that they could still recover compensatory damages measured by the cost to "repair" the defect by lessening the risk of rollover, through modifications to the vehicles' wheels, tires, and suspension. The plaintiffs also sought punitive damages, attorney fees, and equitable relief ordering Ford to furnish "full and effective warning" to class members regarding the rollover dangers and enjoining Ford from selling replacement parts other than those that lessen the risk of rollover.
Ford moved, under Rule 12(b) (6), Ala. R. Civ. P., to dismiss the complaint for failure to state a claim upon which relief can be granted. Ford argued specifically that, under this Court's decision in Pfizer, Inc. v. Farsian, 682 So.2d 405 (Ala. 1996), the plaintiffs could not maintain their fraudulent-suppression claims because, Ford contended they had not alleged that they had suffered any legally cognizable injury. After hearing oral arguments and receiving evidentiary materials from both sides, the trial court, treating Ford's motion as a motion for a summary judgment under Rule 56, Ala. R. Civ. P., denied it. See Rule 12(b), Ala,. R. Civ. P.; Hornsby v. Sessions, 703 So.2d 932 (Ala. 1997); and Travis v. Ziter, 681 So.2d 1348 (Ala. 1996). The trial court then certified the plaintiffs' fraudulent-suppression claims as a class action, see Rule 23, Ala. R. Civ. P., with the named plaintiffs representing a class of all Alabama residents who, between August 26, 1993, and May 31, 1997, had owned Ford Bronco II vehicles. However, the trial court also certified thePfizer question as a controlling issue of law for purposes of Rule 5, Ala. R. App. P., and we granted permission to appeal under that rule.
Section 6-5-102, Ala. Code 1975, provides, "Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." This Court has written "The elements of a suppression claim are 1) a duty to disclose the facts, 2) concealment or nondisclosure of material facts by the defendant, 3) inducement of the plaintiff to act, and 4) action by the plaintiff to his injury." Foremost Ins. Co. v.Parham, 693 So.2d 409, 423 (Ala. 1997), citing Wilson v. Brown,496 So.2d 756 (Ala. 1986).
This appeal involves only the element of actual injury, concerning which this Court has stated:
 "`". . . [F]raud, without damage, or damage, without fraud, gives no cause of action; but, where these two do occur, there an action lieth." Einstein Hirsch Co. v. Marshall Conley, 58 Ala. 153, 160
[1877] Wall v. Graham, 192 Ala. 396, 399, 68 So. 298, 299 [1915].
 "`". . . Deceit and injury must concur. . . . Damage is of the essence of the action of deceit; an essential element to the right of action, and not merely a consequence flowing from it." Wall v. Graham, supra.'"
Boswell v. Liberty Nat'l Life Ins. Co., 643 So.2d 580, 581 (Ala. 1994), quoting Pihakis v. Cottrell, 286 Ala. 579, 583,243 So.2d 685, 688 (1971).
The main issue argued by the parties in this appeal is the applicability of Pfizer, Inc. *Page 628 v. Faisian, supra. In that case, Farsian, the recipient of an artificial heart valve, which had not failed, filed an action in an Alabama state court alleging that the valve's manufacturer had fraudulently induced him to purchase the valve by misleading him about the rate of failure of the same model valve in other recipients. Farsian asserted, among other things, that the manufacturer had marketed the valve "despite knowing of serious manufacturing problems that directly related" to valve failures in other recipients. 682 So.2d at 406. While he admitted that his own valve was, and always had been, functioning properly, Farsian claimed injury by maintaining that his valve, "with its higher rate of fracture and risk of death, [was] worth less than the valve would have been worth if it had been what [the manufacturer] represented it to be." Id. at 407. He also sought to recover damages for emotional distress and for expenses to have his valve surgically removed and replaced. Id. After the case was removed to a federal court, the United States Court of Appeals for the Eleventh Circuit certified to this Court the following question:
 "Does a heart valve implantee have a valid cause of action for fraud under Alabama law if he asserts that the valve's manufacturer fraudulently induced him to have the valve implanted when the damages that he asserts do not include an injury-producing malfunction of the product because the valve has been and is working properly?"
682 So.2d at 406 We answered that the plaintiff could not recover, explaining as follows:
 "Regardless of how Farsian pleads his claim, his claim is in substance a product liability/personal-injury claim — Farsian seeks damages because of the risk that his heart valve may one day fail. Alabama courts have never allowed a recovery based on a product that, like [the plaintiff] Farsian's valve, is and has been working properly. Each of our prior cases in which fraud or other intentional conduct was alleged has involved a failure, a malfunction, or an accident that involved the defendant's products and which injured the plaintiff. . . .
 "Under Alabama law, Farsian's fear that his valve could fail in the future is not, without more, a legal injury sufficient to support his claim. . . .
". . . .
 "Farsian's heart valve has not failed. Instead, it has been working properly and as intended by its manufacturer. . . . Although the parties see different theories of this case — Farsian relying upon Alabama fraud law, while [the manufacturer] argues in the context of product liability law — we conclude that the answer to the certified question, whether it is couched in terms of fraud law or in terms of product liability law, must be that Farsian does not now have a cause of action for damages, because the valve has not failed."
Id. at 407-08 (citations omitted).
Ford argues that Pfizer precludes the plaintiffs' claims in this case. Ford emphasizes that because none of the plaintiffs avers that his or her own vehicle has rolled over, the alleged defect of which the plaintiffs complain has never manifested itself in their vehicles. Ford contends that, just as the plaintiff in Pfizer could not recover under a fraud theory for the risk that his heart valve might fail in the future, the plaintiffs here cannot recover under a theory based solely upon the risk that their Bronco II vehicles could one day roll over. We agree that this case is controlled by Pfizer and that the plaintiffs' claims of injury are insufficient to sustain their action alleging fraudulent suppression.
The plaintiff in Pfizer maintained that he had suffered an economic loss because his valve's risk of failure was higher than what the manufacturer had represented it to be. However, based upon the plaintiffs' concession that his heart valve had never manifested the defect that had affected similar valves in other persons, we held that the plaintiff could not recover. This holding is in accord with the view of most courts, as "[i]t is well established that `[p]urchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not manifested itself in the product they own.'"Weaver v. Chrysler Corp., 172 F.R.D. 96, 99 *Page 629 
(S.D.N.Y. 1997), quoting Hubbard v. General Motors Corp., No. 95 Civ. 4362, 1996 WL 274018, May 22, 1996 (S.D.N.Y. 1996) (not reported in F. Supp.); see also Chin v. Chrysler Corp.,182 F.R.D. 448 (D.N.J. 1998), citing cases. "Where . . . a product performs satisfactorily and never exhibits the alleged defect, no cause of action lies." Weaver, supra, at 100 (citation omitted).
These plaintiffs' claim is similar to the plaintiff's claim inPfizer. These plaintiffs aver that they have suffered lost value by the fact that their vehicles' risk of rollover is greater than was suggested by Ford's silence on the matter. The plaintiffs can point to no specific adverse economic consequences that have been caused by the alleged defect. The plaintiffs acknowledge that their vehicles, like the overwhelmingly vast majority of Bronco IIs, have never manifested the alleged defect in such a way as to be caused to roll over. Indeed, the plaintiffs' allegations give no indication that the vehicles in question, which have been on the road from 8 to 15 years, have provided their owners with anything but satisfactory performance.
The plaintiffs contend that their case is distinguishable fromPfizer, because their counterpart in Pfizer was seeking to recover based upon the possibility that his own valve, which could not then be shown to contain a defect at all, might exhibit one in the future, because defects had occurred in the valves of others. The plaintiffs urge that, by contrast, their vehicles' present performance capacity renders them all defective and unreasonably dangerous. Thus, the plaintiffs argue that their vehicles are all now "manifesting" the complained-of defect, in the sense that their design currently renders them physically incapable of executing certain avoidance maneuvers that a vehicle may be required to perform in the course of its foreseeable use, even though their vehicles have never rolled over because they have not been required to perform such a maneuver. We see no distinction between Pfizer and this present case.
Courts generally do not recognize a distinction between a defect that is "unmanifest" in the sense that it cannot be discerned to exist in a product and a defect that is "unmanifest" in the sense that, although perhaps impacting upon a product's present capacity for safety, it has never actually caused the adverse consequences feared by the user. Rather, courts have generally concluded that claims based upon allegations of inherent product "defects" that have not caused any tangible injury are not viable, even though the alleged defects could be considered "manifest" in the sense argued by the plaintiffs, i.e., that a product's present condition might have rendered it "unreasonably dangerous" in a products-liability context.
The most notable example of this for our purposes is AmericanSuzuki Motor Corp. v. Superior Court, 37 Cal.App.4th 1291,44 Cal.Rptr.2d 526 (1995), where owners of Suzuki Samurai sport utility vehicles brought a class action alleging that their vehicles contained a product "defect" as the result of an undue propensity to rollover and that their vehicles were therefore unfit to be used for their ordinary purpose. Like the plaintiffs in the present case, the Samurai owners did not claim that their own vehicles had actually rolled over, and they sought damages "measured by the cost of repairing the inherent safety defect in the Samurai." Id. at 1294, 44 Cal.Rptr.2d at 528. In rejecting the plaintiffs' claims, the court explained:
 "Because the vast majority of the Samurais sold to the putative class `did what they were supposed to do for as long as they were supposed to do it' (Feinstein v. Firestone Tire and Rubber Co., [535 F. Supp. 595, 603 (S.D.N.Y. 1982)]), we conclude that these vehicles remained fit for their ordinary purpose. This being so, their owners are not entitled to assert a breach of implied warranty action against Suzuki. . . . To hold otherwise would, in effect, contemplate indemnity for a potential injury that never, in fact, materialized. And, compensation would have to be paid for a product `defect' that was never made manifest, in a product that for the life of any warranty actually performed as Suzuki guaranteed it would."
Id. at 1298-99, 44 Cal.Rptr.2d at 531 (emphasis added). Other courts have denied similar claims. See, e.g., In re Air BagProducts Liability Litigation, 7 F. Supp.2d 792, 805 (E.D. La. 1998) (dismissing all claims for lack *Page 630 
of injury, where plaintiffs claimed that air bags were "dangerously defective" because they deployed with excessive force); In re General Motors Corp. Anti-Lock Brake ProductsLiability Litigation, 966 F. Supp. 1525, 1530 (E.D. Mo. 1997) (claims based upon allegations that anti-lock brakes were "defective" because they increased braking distance and therefore actually increased the chance of accidents, dismissed for failure to plead how the defect had ever manifested itself in the plaintiffs' vehicles); and Martin. v. Ford Motor Co., 914 F. Supp. 1449,1455 (S.D. Tex. 1996) (claims alleging that the configuration of a seat-belt restraint system rendered vehicles "unsafe" were rejected on motion for summary judgment, where plaintiffs could not produce evidence of any injury, either physical or economic).
The plaintiffs suggest, further, that the presence of a condition that may render a product "unreasonably dangerous" in a products-liability context necessarily implies that a purchaser has thereby lost the benefit of his bargain. The gravamen of the plaintiffs' claims is that they received inadequate product quality because Ford failed to disclose to them that their vehicles are "unreasonably dangerous," notwithstanding that the vehicles have apparently performed satisfactorily for their entire useful lives. Thus, in order to establish the existence of an economic injury to sustain their fraud claims, the plaintiffs attempt to borrow an element from the Alabama Extended Manufacturer's Liability Doctrine (AEMLD), under which a plaintiff must prove, among other things, that he suffered injury or property damage as the result of a product that is "unreasonably dangerous." See Atkins v. American Motors Corp.,335 So.2d 134, 142 (Ala. 1976). However, this Court has explained that "`the standards of quality of a product, with the attendant risk of the bargain, are entirely distinct from its standards of safety, with a possible unreasonable risk of harm.'" Shell v.Union Oil Co., 489 So.2d 569, 571 (Ala. 1986), quoting MidContinent Aircraft Corp. v. Curry County Spraying Service, Inc.,553 S.W.2d 935, 940 (Tex.Civ.App. 1977). Accordingly, it may be possible for a product to present an "unreasonable" risk of harm within the context of the AEMLD and yet cause no loss of bargain where the product is able to perform its intended purpose.
Nonetheless, in support of their argument that the law entitles them to recover damages to "repair" an existing defect in their vehicles, even absent a claim of any tangible physical or economic injury, the plaintiffs rely almost exclusively upon Inre General Motors Corp. Pick-Up Truck Fuel Tank ProductsLiability Litigation, 55 F.3d 768 (3d Cir. 1995) ("GM Fuel TankLitigation"), a case in which owners of pick-up trucks alleged that the side-mounted location of the fuel tanks on their vehicles increased the risk of post-collision fuel-fed fires and constituted a product defect. A federal district court initially approved a multidistrict class-action settlement between truck owners, who claimed purely economic losses based upon the existence of the defect, and General Motors, the manufacturer of the trucks. The federal district court concluded that one of the major factors weighing heavily in favor of settlement was the difficulty that the plaintiffs would encounter in establishing damages, in that the plaintiffs could not prove that the defect had caused them to suffer a loss in the resale value of the trucks. Id. at 816. The United States Court of Appeals for the Third Circuit reversed the settlement-approval order, holding, among other things, that the district court had erred in finding that the risks of proving damages were so great that they strongly favored a settlement approval. The Court of Appeals held that while a comparison of resale values would be a permissible approach to measuring the value of a defect, it also would have been permissible for the district court to examine the cost of retrofitting the vehicles to a "defect-free" condition, "which effectively puts the truck in the condition in which it allegedly should have been delivered, . . . [as] an alternative measure of the damages arising from the breach of warranty." Id.
In our analysis of this present case, we do not find a proper analogy in the United States Court of Appeals' decision in GMFuel Tank Litigation because of the procedural posture of that case. In its damages analysis, the Court of Appeals was merely attempting "to measure the expected value of litigating the action rather than settling it at [that] current time," for the purposes of *Page 631 
assessing the fairness of an approved class-action settlement. 55 F.3d at 816. Thus, the Court of Appeals did not hold, as the plaintiffs here argue, that class members in that case actually could recover damages based solely upon the cost to "repair" an allegedly defective product, despite the fact that the defect had never manifested itself so as to cause any apparent physical or economic injury. Instead, the GM Fuel Tank Litigation Court merely "did not preclude the idea that class member s who had not actually incurred problems with their automobiles might be entitled to equitable and monetary damages." Chin, supra,182 F.R.D. at 460.
This case is similar to Pfizer in that the plaintiffs may not recover based solely upon the risk that their vehicles could malfunction in the future, given the lack of any claims indicating manifest injury. However, our holding to that effect does not imply that this Court is adopting the "economic loss rule" with respect to claims of fraudulent inducement. Under that rule, a cause of action does not arise under tort theories of negligence, wantonness, strict liability, or the AEMLD where a product malfunctions or is defective and thereby causes damage only to the product itself. See Wellcraft Marine, a Div. ofGenmar Industries, Inc. v. Zarzour, 577 So.2d 414 (Ala. 1990);Dairyland Ins. Co. v. General Motors Corp., 549 So.2d 44 (Ala. 1989); and Lloyd Wood Coal Co. v. Clark Equip. Co., 543 So.2d 671
(Ala. 1989). As the plaintiffs point out, this Court has often allowed a plaintiff to recover damages under a fraudulent-inducement theory for a purely economic loss to a product itself based upon value that is indicated by a seller's representations but not actually received, even where the product was in fact working properly. See, e.g., BMW of North America,Inc. v. Gore, 646 So.2d 619, 621 (Ala. 1994), rev'd on other grounds, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), on remand, 701 So.2d 507 (Ala. 1997); Simmons Auto Sales, Inc. v.Royal Motor Co., 489 So.2d 518 (Ala. 1986); Mobile Dodge, Inc. v.Waters, 404 So.2d 26 (Ala. 1981); Maring-Crawford Motor Co. v.Smith, 285 Ala. 477, 233 So.2d 484 (1970).
This lawsuit involves this question: Does an alleged product defect that has not manifested itself in such a way as to cause any observable adverse physical or economic[1] consequences constitute an "injury" that will support a claim of fraudulent suppression? We simply hold that it does not.
We note that our holding does not leave remediless those who have purchased a vehicle that threatens their safety. We agree with the California court in American Suzuki, supra, that the remedy that will best promote consumer safety and address the parties' concern for their own safety is to petition the National Highway Traffic Safety Administration for a defect investigation. If the NHTSA determines that a vehicle contains a defect, then it may issue an order directing the manufacturer to remedy it through a recall. See 44 Cal.Rptr.2d at 531-32,37 Cal.App.4th at 1299-1300.
Accordingly, we reverse the order of the trial court holding that Ford was not entitled to a summary judgment, and we remand the cause for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOOPER, C.J., and MADDOX, ALMON, HOUSTON, KENNEDY, COOK, SEE, and LYONS, JJ., concur.
[1] The plaintiff in Pfizer did not claim that his heart valve had suffered from a loss in resale value; thus, this Court did not address the issue whether a claim of lost resale value, based upon a yet unrealized risk of malfunction, could be sufficient to sustain a fraud action. Given the plaintiffs' acknowledgment that they do not claim that their vehicles suffered a loss of value in the resale market, we need not resolve that question here either. We note, however, that some courts have at least implied that proof of lost resale value could be a sufficient economic injury to sustain such a fraud claim, even where vehicles have not failed to perform their intended function. See Connick v.Suzuki Motor Co., Ltd., 1, 4 Ill.2d 482, 221 Ill.Dec. 389,675 N.E.2d 584 (1996) (reinstating a claim, under the Illinois Consumer Fraud Act, alleging that Suzuki Samurai sport utility vehicles had lost resale value because of their propensity to roll over);Martin v. Ford Motor Co., supra, at 1455 n. 7 (at least leaving open the possibility that, had the plaintiffs presented sufficient evidence of their vehicles' lost resale value, their claims might have survived a summary judgment motion). *Page 632