# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### November 13, 2007 Session Heard at Memphis

## BILL WALKER ET AL. v. SUNRISE PONTIAC-GMC TRUCK, INC.

**Appeal by permission from the Court of Appeals, Western Section**
**Circuit Court for Shelby County**
**No. CT-005518-04     Jerry Stokes, Judge**

---

**No. W2006-01162-SC-S09-CV - Filed February 13, 2008**

---

We granted the defendant's application for permission to appeal in this case to determine whether a class action may be certified in a claim brought under the Tennessee Consumer Protection Act ("TCPA"), Tennessee Code Annotated sections 47-18-101–125 (2001), or in a claim for common law misrepresentation and fraud. The plaintiff, on his own behalf and on behalf of similarly situated individuals, filed a complaint against Sunrise Pontiac-GMC Truck, Inc., challenging sales transactions in which buyers were charged "dealer incurred costs" as part of the purchase price. The complaint alleged class action claims for, among other things, Tennessee Consumer Protection Act violations and common law misrepresentation and fraud. The trial court denied the defendant's motion for summary judgment with respect to the class certification of the TCPA, misrepresentation and fraud claims. The court granted the defendant's motion for a Rule 9 interlocutory appeal and to stay discovery. The Court of Appeals denied the motion for a Rule 9 appeal on the basis that we would soon be addressing the same issues in a different case.[1] We granted the defendant's application for permission to appeal when the issue remained unresolved. Upon thorough review of the record and the legal issues presented, we hold that class certification is unavailable under the TCPA and that class certification was not appropriate in the plaintiff's claims for common law fraud and misrepresentation due to the individual nature of those claims.

**Tenn. R. App. P. 11; Judgment of the Court of Appeals is Reversed and Remanded**

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which JANICE M. HOLDER, CORNELIA A. CLARK, and GARY R. WADE, JJ., and HOLLY M. KIRBY, Sp.J., joined.

George T. Lewis, III and Kristine L. Roberts, Memphis, Tennessee, for the appellant, Sunrise Pontiac-GMC Truck, Inc.

Gary K. Smith, C. Wesley Fowler, and James D. Causey, Memphis, Tennessee, and Gordon Ball, Knoxville, Tennessee, for the appellee, Bill Walker.

---

[1] McNall v. MasterCard Int'l, Inc., W2005-02422-SC-S09-CV (granted May 1, 2006).

Douglas S. Johnston, Jr., Nashville, Tennessee, and R. Sadler Bailey, Memphis, Tennessee, for Amicus Curiae, Tennessee Association for Justice.

**OPINION**

I. Factual Background

On or about January 17, 2004, the plaintiff, Bill Walker, bought a 2002 Ford Taurus automobile from the defendant, Sunrise Pontiac-GMC Truck, Inc. ("Sunrise Pontiac"). On September 23, 2004, Mr. Walker filed a class action suit against Sunrise Pontiac, alleging that Sunrise Pontiac charged "Dealer Incurred Costs" or "DIC" as a part of the vehicle's price and that Sunrise Pontiac fraudulently misrepresented the nature of those costs to him during the transaction. Mr. Walker requested that the court certify a class of "[a]ll individuals in Tennessee who purchased motor vehicles from Sunrise Pontiac and with respect to which paid 'Dealer Incurred Costs' . . . ."

Mr. Walker testified via deposition regarding his car-buying experience at Sunrise Pontiac. He was in the market to buy a car because his previous vehicle was old and in need of expensive repairs. Prior to visiting Sunrise Pontiac, he looked at a used Ford Taurus at a local Ford dealership and a similar car at another used car dealership. He also used the internet to research features and prices of the cars that interested him.

When he arrived at Sunrise Pontiac and found the 2002 Ford Taurus that suited his needs, he already had an idea of the market rate for a used Taurus. He decided to deal with John Haynes, a salesman at Sunrise Pontiac, because they were already acquaintances. After he agreed with Mr. Haynes on a price for the vehicle, he met with the finance manager to complete the paperwork. It was only after he signed the final buyer agreement that he signed a worksheet that showed the breakdown of the costs and fees, including the DIC.

Some time after Mr. Walker bought the car, Mr. Haynes called him to tell him that he and his attorney were looking into some fees that the dealership had been adding on to used car sales. According to Mr. Haynes, the fees that the dealership had been categorizing as "Dealer Incurred Costs" were nothing more than pure profit for the dealership and had no connection to any costs associated with the individual cars. Mr. Haynes asked Mr. Walker if he was interested in pursuing the issue and getting his money back for the fees he paid. Mr. Walker agreed, copying his paperwork, and giving those copies to Mr. Causey, the attorney working with Mr. Haynes. Mr. Walker spoke with Mr. Haynes again when Mr. Haynes approached him about being the lead plaintiff in the case against Sunrise Pontiac.

John Haynes testified regarding his employment at Sunrise Pontiac and his role in selling Mr. Walker his automobile. Mr. Haynes began working at Sunrise Pontiac in December of 1993 as a salesman on the economy used car lot and was later promoted to manager of that lot. He and the other salespeople at Sunrise Pontiac received training three times a week at meetings that were led by Robert Berkheimer, the owner of the dealership, or by Terry Sullivan, one of the managers. As part of the training, they were taught how to use the sales worksheets as negotiation tools in a way

that would generate the most profit.

When a customer approached him, Mr. Haynes would use one of these handwritten worksheets in calculating price, fees, taxes, and then payments. Included on the worksheet were the DIC, which were to be included in every sale. The standard DIC was approximately $400, but at times it was higher. He heard of other salespeople bragging about collecting DIC as high as $900. If the fee was questioned by the customer, he would waive the fee rather than lose the sale. He and the other salespeople told the customers that the DIC covered such expenses as insurance, security, car washing, and other costs that could not be attributed to a particular vehicle. However, it was his understanding that such costs were built into the price of the car, so the DIC was pure profit to the dealership. In 2004, the dealership stopped charging the DIC, and instead increased the amount of the documentation, or "doc" fee that it charged.

Mr. Haynes testified that there are a variety of ways that deals are negotiated and closed. Some customers are more careful than others and negotiate harder over price or fees. Some customers end up paying more of the DIC than others; some pay none. When Mr. Walker came in to buy the Ford Taurus, there was some difficulty in closing the deal after the final price was agreed upon. Mr. Walker was having trouble understanding certain fees associated with the deal, so Mr. Haynes completed the worksheet with him, trying to explain the fees. These included $400 of DIC. Mr. Haynes testified that he "picked up a DIC of $400 trying to get more profit because it was a nothing deal."

Several other people from Sunrise Pontiac testified via deposition, including Robert Berkheimer, the owner of the dealership. Mr. Berkheimer testified that he has sales meetings every Monday, Wednesday, and Saturday for all salespeople and managers. They discuss any problems that may arise, new programs offered by General Motors, and go over the current inventory.

He explained that the DIC are costs that the dealership incurs in connection with the sale of cars, but which cannot be assigned to a particular car. These costs include insurance, advertising, interest, car washes on the lot, and security. These costs are kept separate from other operating costs. There is no formal written policy concerning DIC at the dealership. DIC are charged based on the average number of cars sold at the end of each month, each year, and on expenses. There is no one specifically responsible for determining this amount, but he set a maximum amount of $389. He would like to see it collected on all deals, but every deal is different, and ultimately, very few people end up paying the DIC.

Mark Halterman testified that he worked as a salesman on the economy lot at Sunrise Pontiac for approximately two years, leaving in the middle of 2004. He received training at the meetings led by Terry Sullivan and Robert Berkheimer. He was told that the DIC covered expenses such as clean up and maintenance.

The salespeople were trained to use the worksheet as a way to begin negotiations with a customer. All customers would negotiate differently. Those customers with worse credit ratings

were less apt to challenge fees such as the DIC. The standard DIC was around $389, but he heard of other salespeople charging more or less.

Bethany Michell worked in the finance department of Sunrise Pontiac beginning in 2001, becoming finance manager in 2003. As finance manager, she attended the meetings with the salespeople. At these meetings, Mr. Berkheimer discussed the amount of DIC to be charged–$400–and what the fee was for–"anything that cannot be charged directly to a stock number, such as insurance, the washing of cars, lot security and advertising."

The salespeople used a worksheet as a negotiation tool when dealing with the customer. There were several places to enter different numbers, including the price, DIC, tax, tags, DOC fee, and trade-in allowance. The only things that are negotiable are the price, DIC, and trade-in allowance. The documentation fee was $198. The DIC was never listed on the buyer's order or final contract; when it was collected, it was rolled into the final sales price.

Sunrise Pontiac eventually stopped charging DIC. At one of their meetings, Mr. Berkheimer said they were changing computer systems and that there was no place for the DIC on there. About that time, the documentation fee went from $198.50 to about $399.

Peter Kelly was the finance manager at Sunrise Pontiac beginning in 1998 or 1999, leaving in 2005. While at Sunrise Pontiac, he learned about the DIC, which he understood to be "an additional charge for gross profit."

Mr. Kelly testified that the salespeople would use a worksheet to negotiate with the customer, and that all customers would negotiate differently. For example, some customers would be more concerned with the total cost while others were more concerned with amount of the monthly payments. While they were not specifically told to target minorities, he said that he heard it discussed because the salespeople "usually make more money on them."

## II. Procedural History

The original class complaint filed by Mr. Walker asserted the following claims: 1) violation of the Tennessee Consumer Protection Act ("TCPA"); 2) intentional misrepresentation and fraud in the inducement; 3) negligent misrepresentation and fraud; 4) violation of the Tennessee Trade Practices Act; 5) unjust enrichment; 6) money had and received; 7) civil conspiracy; and 8) fraudulent concealment. Sunrise Pontiac both denied all allegations and objected to class certification.

Sunrise Pontiac and its original co-defendant, Sunrise Pontiac-GMC at Wolfchase, LLC,[2] filed a motion for partial summary judgment contending that all of Mr. Walker's claims failed as a

_____

[2] Sunrise Pontiac-GMC at Wolfchase, LLC, is an automobile dealership located in Bartlett, Tennessee, and is a separate and distinct corporation from Sunrise Pontiac. Both dealerships are owned, however, by Robert Berkheimer. All claims against Sunrise Pontiac-GMC at Wolfchase were dismissed by the trial court, and Mr. Walker did not appeal that ruling.

matter of law.  The trial court granted the motion in part, dismissing all claims brought against Sunrise Pontiac-GMC at Wolfchase, LLC, and all claims against Sunrise Pontiac except for those brought under the TCPA and those based on common law fraud and misrepresentation.

Sunrise Pontiac then filed a Motion for Partial Summary Judgment on January 17, 2006, on Mr. Walker's class claims, arguing that class actions are not allowed under the TCPA and that his claims alleging common law fraud and misrepresentation are not appropriate for class treatment. The trial court denied the motion, finding that the class claims did not appear to be prohibited under the TCPA.

Sunrise Pontiac next filed a motion for interlocutory appeal and to stay discovery, which the trial court granted.  In its application for permission to file an interlocutory appeal ("Rule 9 Application") to the Court of Appeals, Sunrise Pontiac requested review of whether the plaintiff's claims brought under the TCPA and those alleging fraud and misrepresentation are certifiable as class actions.  The Court of Appeals denied the Rule 9 Application.  We granted Sunrise Pontiac's application for permission to appeal that denial.

## III.  Standard of Review

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04.  A ruling on a motion for summary judgment involves only questions of law and not disputed issues of fact. Owner-Operator Indep. Drivers Ass'n v. Concord EFS, Inc., 59 S.W.3d 63, 68 (Tenn. 2001). Accordingly, our review of a denial of summary judgment is de novo with no presumption of correctness as to the trial court's findings.  Teter v. Republic Parking Sys., Inc., 181 S.W.3d 330, 337 (Tenn. 2005); Webber v. State Farm Mut. Auto. Ins. Co., 49 S.W.3d 265, 269 (Tenn. 2001).  The evidence must be viewed "in the light most favorable to the nonmoving party," and all reasonable inferences must be drawn in the nonmoving party's favor.  Staples v. CBL & Assocs., Inc., 15 S.W.3d 83, 89 (Tenn. 2000).

Furthermore, this case requires us to construe certain provisions of the TCPA.  Issues of statutory construction are questions of law which this Court reviews de novo with no presumption of correctness accorded the trial court's conclusions.  Lavin v. Jordon, 16 S.W.3d 362, 364 (Tenn. 2000).  When interpreting statutes, this Court "must ascertain and give effect to the legislative intent without restricting or expanding the statute's intended meaning or application."  Perrin v. Gaylord Entm't Co., 120 S.W.3d 823, 826 (Tenn. 2003).

## IV.  Analysis

In order to establish class certification, Mr. Walker has the burden of showing that the prerequisites of Rule 23 of the Tennessee Rules of Civil Procedure have been satisfied.  Hamilton v. Gibson County Util. Dist., 845 S.W.2d 218, 225 (Tenn. Ct. App. 1992).  A class action may be brought by a representative party on behalf of all members of the class only if all of the following are met:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interest of the class.

Tenn. R. Civ. P. 23.01.

In addition to meeting the requirements of Rule 23.01, a proposed class must also meet one of the three requirements listed in Rule 23.02. Here, Mr. Walker brought his action relying on subsections (2) and (3) of Rule 23.02, which state:

(2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . . .

(3) The court finds that the question of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Tenn. R. Civ. P. 23.02. The existence of separate issues of law and fact, particularly regarding damages, do not necessarily negate class action certification, so long as common legal and factual issues, including the nature of the claim and of the relief, predominate. Meighan v. U.S. Sprint Comm. Co., 924 S.W.2d 632, 637 (Tenn. 1996).

"[T]he determination of whether an action should proceed as a class action is a matter which is left to the sound discretion of the trial judge. Only upon a finding of an abuse of that discretion should the trial judge's decision be modified on appeal." Id. In other words, a decision by the trial court "will only be modified if it was inconsistent with the substantial weight of the evidence or resulted from the trial court's misinterpretation or misapplication of controlling legal principles." Freeman v. Blue Ridge Paper Prod., Inc., 229 S.W.3d 694, 703 (Tenn. Ct. App. 2007) (citing White v. Vanderbilt Univ., 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999)).

A. *Tennessee Consumer Protection Act*

Mr. Walker's complaint alleged that Sunrise Pontiac violated the TCPA by misrepresenting the true nature of the DIC. Sunrise Pontiac contends, however, that the TCPA cannot be applied to class actions and, instead, is only available to individual plaintiffs. The TCPA was enacted to "protect consumers . . . from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Tenn. Code Ann. § 47-18-102(2) (2001). It provides, in pertinent part:

Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use of employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, *may bring an action individually* to recover actual damages.

Id. § 47-18-109(a)(1) (emphasis added).

Prior to 1991, the TCPA provided that any person could bring an action for damages "individually, but not in a representative capacity." Id. § 47-18-109(a)(1) (1988). In 1991, the legislature amended the TCPA to remove the phrase "but not in a representative capacity" from section 47-18-109(a)(1). See 1991 Tenn. Pub. Acts Ch. 468. Mr. Walker argues that by removing this restriction, the legislature meant to allow class actions. Sunrise Pontiac counters that the plain language of the statute, as it exists post-amendment, does not allow for class actions, and because the language is clear, we need not look to legislative history.

When construing statutes, our duty is to ascertain and give effect to the intent and purpose of the legislature. Lipscomb v. Doe, 32 S.W.3d 840, 844 (Tenn. 2000); Freeman v. Marco Transp. Co., 27 S.W.3d 909, 911 (Tenn. 2000). "'Legislative intent is to be ascertained whenever possible from the natural and ordinary meaning of the language used, without forced or subtle construction that would limit or extend the meaning of the language.'" Lipscomb, 32 S.W.3d at 844 (quoting Hawks v. City of Westmoreland, 960 S.W.2d 10, 16 (Tenn. 1997)); see also Eastman Chem. Co. v. Johnson, 151 S.W.3d 503, 507 (Tenn. 2004); State v. Blackstock, 19 S.W.3d 200, 210 (Tenn. 2000).

"When the statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would limit or expand the statute's application." Eastman Chem. Co., 151 S.W.3d at 507; see also Carson Creek Vacation Resorts, Inc. v. State Dep't of Revenue, 865 S.W.2d 1, 2 (Tenn. 1993). "Where the language contained within the four corners of a statute is plain, clear, and unambiguous, the duty of the courts is simple and obvious, 'to say sic lex scripta, and obey it.'" Hawks, 960 S.W.2d at 16 (quoting Miller v. Childress, 21 Tenn. 320, 321-22 (1841)).

Only if the plain language of a statute is ambiguous must the Court look beyond the statutory language to determine the legislature's intent. See Perrin v. Gaylord Entm't Co., 120 S.W.3d 823, 826 (Tenn. 2003); Lavin v. Jordon, 16 S.W.3d 362, 366 (Tenn. 2000). "'A statute is ambiguous if the statute is capable of conveying more than one meaning.'" LeTellier v. LeTellier, 40 S.W.3d 490, 498 (Tenn. 2001) (quoting Bryant v. HCA Health Servs. of N. Tenn., Inc., 15 S.W.3d 804, 809 (Tenn. 2000)).

Tennessee Code Annotated section 47-18-109(a)(1) is unambiguous. It states that "[a]ny person . . . may bring an action *individually* to recover actual damages." Id. (emphasis added). Review of multiple dictionaries supports the interpretation that the word "individual" refers to a single person instead of a class or group of people. See Black's Law Dictionary 773 (6th ed. 1990) ("a single person as distinguished from a group or class"); Webster's II, New College Dictionary 578

(3rd ed. 2005) ("[o]f or relating to a single human"); The Random House Dictionary of the English Language 974 (2d ed. 1987) ("a single human being, as distinguished form a group"). Furthermore, the TCPA uses the singular terms "individual" and "person" throughout. See Tenn. Code Ann. § 47-18-103(2) (defining "[c]onsumer" as "any natural person . . . ."); Tenn. Code Ann. § 47-18-103(9) (defining "[p]erson" as "a natural person, individual . . . ."). When a statute is unambiguous, as this one is, it is enforced as written. See Eastman Chem. Co., 151 S.W.3d at 507.

Mr. Walker, however, contends that the word "individually" is ambiguous in the context of the TCPA, and that when read in conjunction with the legislative history, the term does include the authorization for class actions. Mr. Walker argues that it is ambiguous because the term is not defined by the statute and because the statute remains silent as to class actions. If an ambiguity exists, we look to the entire statutory scheme to ascertain the legislative intent and purpose. State v. Walls, 62 S.W.3d 119, 121 (Tenn. 2001); Marco Transp. Co., 27 S.W.3d at 911-12. In ascertaining the legislature's intent, "'[w]e must seek a reasonable construction in light of the purposes, objectives, and spirit of the statute based on good sound reasoning.'" Scott v. Ashland Healthcare Ctr., Inc., 49 S.W.3d 281, 286 (Tenn. 2001) (quoting State v. Turner, 913 S.W.2d 158, 160 (Tenn. 1995)).

It is Mr. Walker's contention that the legislature meant to allow class actions when it amended the TCPA in 1991. Prior to 1991, section 47-18-109(a)(1) provided that a person may bring an action for damages "individually, but not in a representative capacity . . . ." In 1991, the TCPA was amended to remove the phrase "but not in a representative capacity." See 1991 Tenn. Pub. Acts Ch. 468. Mr. Walker contends that the prior prohibition against action "in a representative capacity" applied to class actions, and by removing that language, the Legislature was lifting the prohibition of class actions under the TCPA.

The mere removal of the phrase "not in a representative capacity" does not change the meaning of the word "individually." The phrase "in a representative capacity" does not necessarily apply to class actions. It can refer to a variety of instances in which one individual brings an action on behalf of another individual, including those brought by executors of estates, trustees of trusts, parents on behalf of minor children, or legal guardians on behalf of disabled persons. Prior to 1991, actions had two limits placed on them: they had to be brought individually and they could not be brought in a representative capacity. At that time, actions brought on behalf of others were prohibited. Following the amendment, actions are allowed to be brought "in a representative capacity," but the qualifier of that action being brought "individually" still applies. In other words, the present statute allows the type of case in which an individual, i.e. a next friend or executor, brings an action on behalf of another individual. Class actions are still prohibited because they are not actions brought "individually."

As a point of contrast, we note that several other states' consumer protection legislation *specifically authorize* class actions. See, e.g., Cal. Civ. Code § 1781 (West 1998) (providing for class actions under the Consumer Legal Remedies Act); Conn. Gen. Stat. Ann. § 42-110g(b) (West 2007) (allowing class actions under Connecticut's Unfair Trade Practices Act); Mo. Ann. Stat. § 407.025 (West 2001) (allowing class actions for violation of the Missouri Merchandising Practices

Act); Tex. Ins. Code Ann. § 541.251(a) (Vernon 2007) (class action authorized for individual claimants as well as for Attorney General).

While no published Tennessee case has directly addressed the issue of the meaning of the phrase in question, at least one panel of the Tennessee Court of Appeals has done so in dicta. In Tucker v. Sierra Builders, 180 S.W.3d 109, 115 n. 9 (Tenn. Ct. App. 2005), the court observed that "[t]he Act limits private actions to 'individual' claims" and, "[a]ccordingly, class actions cannot be maintained under the TCPA." Id. Other courts have reached the same conclusion as Tucker. The Middle District of Tennessee, in Thomas v. LG Elec. U.S.A., Inc., No. 3:07-0444, 2007 WL 4293043, at *4 (M.D. Tenn. Dec. 6, 2007), held that class actions could not be maintained under the TCPA following the 1991 amendment. Likewise, the Eastern District of Michigan refused to certify a class action under the TCPA because "[p]laintiffs may only bring an action 'individually,' and not as members of the class, under the TCPA." Durant v. ServiceMaster Co., 208 F.R.D. 229, 233 (E.D. Mich. 2002) (citing Chaffin v. Norwegian Cruise Line Ltd., 1999 WL 188295, at *2 n.1 (Tenn. Ct. App. Apr. 7, 1999)).

Mr. Walker also argues that the court should allow class actions under the TCPA as a matter of public policy. He contends that allowing class actions would be consistent with the TCPA's goal of protecting the consumer by making it easier for the consumer to bring smaller, but common claims against parties who violate the Act. While we recognize that the TCPA must be construed liberally, see Tenn. Code Ann. § 47-18-102 (2001), we will not extend the statute's provisions beyond its obvious meaning.

The TCPA provides consumers with numerous avenues to seek and receive relief, fully satisfying the statute's stated purpose of protecting consumers without including class actions. First is the most basic form of relief: a person may file an action, *individually*, to recover damages. Tenn. Code Ann. § 47-18-109(a)(1) (2001). Second, and more important to the protection of *classes* of consumers, the Attorney General and the Division of Consumer Affairs of the Tennessee Department of Commerce and Insurance can investigate and prosecute violations of the TCPA. See id. §§ 47-18-106, -108. The Attorney General's power to bring actions on behalf of consumers is akin to a class action. See id. § 47-18-108. In such actions, the remedy is not limited to injunctive relief, but rather the court may award restitution on behalf on those consumers who have suffered an ascertainable loss. See id. § 47-18-108(b)(1). The Attorney General may also accept assurance of voluntary compliance, which may be conditioned on restitution. See id. § 47-18-107(b). Read together, these provisions demonstrate that the legislature provided several clearly articulated avenues by which the TCPA can fully protect and benefit consumers.

*B. Fraud and Misrepresentation Claims*

Mr. Walker also alleges that Sunrise Pontiac committed fraud and misrepresentation in falsifying the true nature of the DIC. In order to prove a claim based on fraudulent or intentional misrepresentation, a plaintiff must show that:

1) the defendant made a representation of an existing or past fact; 2) the

representation was false when made; 3) the representation was in regard to a material fact; 4) the false representation was made either knowingly or without belief in its truth or recklessly; 5) plaintiff reasonably relied on the misrepresented material fact; and 6) plaintiff suffered damage as a result of the misrepresentation.

Metro. Gov't of Nashville & Davidson County v. McKinney, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992); see First Nat'l Bank v. Brooks Farms, 821 S.W.2d 925, 927 (Tenn. 1991); Lopez v. Taylor, 195 S.W.3d 627, 634 (Tenn. Ct. App. 2005). Similarly, to succeed on a claim for negligent misrepresentation, a plaintiff must establish "that the defendant supplied information to the plaintiff; the information was false; the defendant did not exercise reasonable care in obtaining or communicating the information and the plaintiffs justifiably relied on the information." Williams v. Berube & Assocs., 26 S.W.3d 640, 645 (Tenn. Ct. App. 2000); see Robinson v. Omer, 952 S.W.2d 423, 427 (Tenn. 1997).

As noted above, Rule 23.02(3) requires a finding that "the question of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." This requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997).[3]

Fraud actions are often not well suited for class-action certification because of differences in one or more of the specific elements necessary to prove the fraud. See Fed. R. Civ. P. 23(b)(3), advisory committee's note to 1966 amendment ("a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed"). "Whether a fraud claim is suitable for class-action treatment depends on the degree of similarity between the representations made to the class members." Ex Parte Household Retail Serv., Inc., 744 So. 2d 871, 877 (Ala. 1999).

"[A]s a general rule, an action based substantially on oral rather than written communications is inappropriate for treatment as a class action." Johnston v. HBO Film Mgmt., Inc., 265 F.3d 178, 190 (3d Cir. 2001); see also Simon v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 482 F.2d 880, 882 (5th Cir. 1973). "Courts have generally denied certification of oral communications because of the highly individualized nature of the statements between class members and defendants." Kaser v. Swann, 141 F.R.D. 337, 339 (M.D.Fla. 1991) (citing Seiler v. E.F. Hutton & Co., 102 F.R.D. 880, 884 (D.N.J. 1984)). A plaintiff can, however, have a class action certified on fraud claims based on oral misrepresentations by showing that the oral misrepresentations were uniform and that no material variations existed in the statements made to each class member. Id. (citing Grainger v. State Sec. Life Ins. Co., 547 F.2d 303, 307 (5th Cir. 1977)).

---

[3] Because Tennessee Rule of Civil Procedure 23.02(3) and Rule 23(b)(3) of the Federal Rules of Civil Procedure use identical language, federal authority is persuasive. Meighan, 924 S.W.2d at 637 n.2.

"In cases involving a mix of both oral and written misrepresentations, courts generally find that the claims of the class members are not sufficiently similar to allow class treatment." Household Retail Serv., 744 So.2d at 878. "However, class treatment of claims involving both oral and written misrepresentations can be appropriate when the plaintiff demonstrates (1) that no material variation exists among the oral statements made to the class and (2) that no material variation exists between the oral and written statements." Id.

Sunrise Pontiac argues that class certification is inappropriate because there are material variations among class members, including unique representations about the nature of the DIC, reliance by the purchasers, causation, and damages. While the trial court found that class certification was appropriate, we hold that the evidence preponderates against the trial court's decision.

We are most persuaded by the evidence that there was no uniform representation about the DIC. Every transaction to buy an automobile is unique, and according to Mr. Walker's own witness, statements made to customers varied from negotiation to negotiation. Without hearing from each customer and salesperson, it is unknowable whether DIC were the subject of discussion between them and if so, what representations, if any, were made by the salesperson. Moreover, these were oral representations made to customers. These were not part of a standardized written contract, nor were they even part of a canned sales pitch where every customer heard the same explanation from the salesperson. Given the individual nature of each transaction, questions of law or fact common to the members of the class do not predominate over any questions affecting only individual members. See Tenn. R. Civ. P. 23.02(3).

## IV. Conclusion

In sum, we hold that the TCPA does not provide for class certification of claims brought thereunder. Furthermore, we hold that due to the individualized nature of the alleged common law fraud and misrepresentation claims, class certification should not have been granted by the trial court. As such, we reverse the trial court's denial of Sunrise Pontiac's motion for partial summary judgment on the issue of class certification and remand the case back to the trial court.

The costs of this appeal are taxed to Bill Walker, and his sureties, for which execution may issue if necessary.

_____
WILLIAM M. BARKER, CHIEF JUSTICE

-11-