In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-1590

STEVEN J. THOROGOOD, individually and on behalf
of all others similarly situated,

*Plaintiff-Appellee*,

*v.*

SEARS, ROEBUCK AND COMPANY,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 1999—**Harry D. Leinenweber**, *Judge*.

ARGUED SEPTEMBER 15, 2008—DECIDED OCTOBER 28, 2008

Before POSNER, KANNE, and EVANS, *Circuit Judges*.

POSNER, *Circuit Judge*.   The plaintiff, a Tennessean, bought a Kenmore-brand clothes dryer from Sears Roebuck (Kenmore is a Sears brand name). The words "stainless steel" were imprinted on the dryer, and point of sale advertising explained that this meant that the drum in which the clothes are dried inside the dryer was made of stainless steel. The plaintiff says he thought it meant that the drum was made *entirely* of stainless steel.

Part of the front of the drum, a part the user would see only if he craned his head inside the drum, is made of a ceramic-coated "mild" steel, which is not stainless steel because it doesn't contain chromium; stainless steel is a steel alloy that is at least 11.5 percent chromium. The plaintiff alleges that the mild-steel part of the drum rusted and stained the clothes that he dried in his dryer.

He filed this class action suit in federal district court on behalf of himself and the other purchasers, scattered across 28 states plus the District of Columbia, of the half million or so Kenmore dryers advertised as containing stainless steel drums. He claims that the sale of a dryer so advertised is deceptive unless the drum is made entirely of stainless steel, since if it is not it may rust and cause rust stains on the clothes in the dryer. His individual claim is that the representation that the dryer contained a stainless steel drum violated the Tennessee Consumer Protection Act, Tenn. Code. Ann. §§ 47-18-101 *et seq*. The Act provides in pertinent part that "any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages." *Id.*, § 47-18-109(a)(1). The members of the class that the plaintiff represents are alleged to have similar claims under similarly worded state consumer protection statutes in their own states. Although some members of the huge class are citizens of the states of which Sears is a corporate citizen (New York and Illinois), so that diversity of citizenship is not complete, the suit properly

invoked federal jurisdiction under the Class Action Fairness Act, 28 U.S.C. §§ 1332(d), 1453, 1711-1715, since the amount in controversy exceeds $5 million. The district court certified the class, and we have accepted the defendant's appeal from the class certification. Fed. R. Civ. P. 23(f).

The class action is an ingenious device for economizing on the expense of litigation and enabling small claims to be litigated. The two points are closely related. If every small claim had to be litigated separately, the vindication of small claims would be rare. The fixed costs of litigation make it impossible to litigate a $50 claim (our guess—there is no evidence—of what the average claim of a member of the plaintiff's class in this case might be worth) at a cost that would not exceed the value of the claim by many times. But the class action device has its downside, or rather downsides. There is first of all a much greater conflict of interest between the members of the class and the class lawyers than there is between an individual client and his lawyer. The class members are interested in relief for the class but the lawyers are interested in their fees, and the class members' stakes in the litigation are too small to motivate them to supervise the lawyers in an effort to make sure that the lawyers will act in their best interests. *Saylor v. Lindsley*, 456 F.2d 896, 900-01 (2d Cir. 1972) (Friendly, J.); see also Susan P. Koniak & George M. Cohen, "Under Cloak of Settlement," 82 *Va. L. Rev.* 1051, 1053-57 (1996) (describing the class action as "lawyer self-dealing on a grand scale," *id*. at 1053); Jonathan R. Macey & Geoffrey P. Miller, "The Plaintiff's Attorney's Role in

Class Action and Derivative Litigation," 58 *U. Chi. L. Rev*. 1, 22-26 (1991).

The defendants in class actions are interested in minimizing the sum of the damages they pay the class and the fees they pay the class counsel, and so they are willing to trade small damages for high attorneys' fees, especially since, as Judge Friendly put it, "a juicy bird in the hand is worth more than the vision of a much larger one in the bush, attainable only after years of effort not currently compensated and possibly a mirage." *Alleghany Corp. v. Kirby*, 333 F.2d 327, 347 (2d Cir. 1964); see also Bruce L. Hay, "Asymmetric Rewards: Why Class Actions (May) Settle for Too Little," 48 *Hastings L.J.* 479, 485-89 (1997); Bruce L. Hay & David Rosenberg, " 'Sweetheart' and 'Blackmail' Settlements in Class Actions," 75 *Notre Dame L. Rev.* 1377, 1389-92 (2000). The result of these incentives is to forge a community of interest between class counsel, who control the plaintiff's side of the case, and the defendants. (For a notable example, see *Reynolds v. Beneficial National Bank*, 288 F.3d 277 (7th Cir. 2002); see also *Mars Steel Corp. v. Continental Illinois National Bank & Trust Co.*, 834 F.2d 677, 681-82 (7th Cir. 1987).) The judge who presides over the class action and must approve any settlement is charged with responsibility for preventing the class lawyers from selling out the class, but it is a responsibility difficult to discharge when the judge confronts a phalanx of colluding counsel.

A further problem with the class action is the enhanced risk of costly error. "When enormous consequences turn on the correct resolution of a complex factual question, the

risk of error in having it decided once and for all by one trier of fact rather than letting a consensus emerge from several trials may be undue." *Mejdrech v. Met-Coil Systems Corp.*, 319 F.3d 910, 912 (7th Cir. 2003); see also *Castano v. American Tobacco Co.*, 84 F.3d 734, 746 (5th Cir. 1996); Lance P. McMillian, "The Nuisance Settlement 'Problem,'" 31 *Am. J. Trial Advoc.* 221, 252-53 (2007); Jeffrey W. Stempel, "Class Actions and Limited Vision," 83 *Wash. U. L.Q.* 1127, 1213-14 (2005). Suppose a company is sued in a number of different cases for selling a defective product. It wins some of the cases and loses some, so that the aggregate outcome is a fair reflection of the uncertainty of the plaintiffs' claims. But when the central issue in a case is given class treatment and so resolved by a single trier of fact, a trial becomes a roll of the dice; a single throw will determine the outcome of a large number of separate claims—there is no averaging of divergent responses from a number of triers of fact having different abilities, priors, and biases.

The risk is asymmetric when the number of claims aggregated in the class action is so great that an adverse verdict would push the defendant into bankruptcy, for then the defendant will be under great pressure to settle even if the merits of the case are slight. *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1298-99 (7th Cir. 1995); Hay, "'Sweetheart' and 'Blackmail' Settlements in Class Actions," *supra*, at 1391-92; Barry F. McNeil & Beth L. Fancsal, "Mass Torts and Class Actions: Facing Increased Scrutiny," 167 F.R.D. 483, 489-90 (1996). It is true that in principle and often in practice, shareholders whose shares in a particular company are part of a diversified

portfolio of securities are indifferent to the fortunes of a particular stock in their portfolio. But corporate managers—the shareholders' imperfect agents—are not indifferent to bankruptcy and so they are unwilling to bet their company on the outcome of a trial. This, however, is not such a case, as the aggregate claims are well within Sears Roebuck's ability to pay.

There is still another downside to the class action, and it is well illustrated by this case. It is the tendency, when the claims in a federal class action are based on state law, to undermine federalism. *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1020-21 (7th Cir. 2002); *In re Rhone-Poulenc Rorer, Inc.*, *supra*, 51 F.3d at 1300-02; *Elizabeth M. v. Montenez*, 458 F.3d 779, 788 (8th Cir. 2006). Our plaintiff wants to litigate in a single federal district court half a million claims wrested from the control of the courts of the 29 jurisdictions in which those claims arose and the laws of which govern the claimants' entitlement to and scope of relief. The instructions to the jury on the law it is to apply will be an amalgam of the consumer protection laws of the 29 jurisdictions, and procedural rules by which particular jurisdictions expand or contract relief will be ignored. The Tennessee Consumer Protection Act, for example, does not authorize class actions. *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301 (Tenn. 2008).

Sears argues that the Tennessee rule precludes the maintenance of the present case as a class action. That is wrong. The procedure in diversity suits is governed by federal law. What is true is that some procedural rules

are intended to implement substantive policy, and such rules do control in diversity cases. The clearest example is the parol evidence rule of contract law. Another is the contract doctrine of "mend the hold," which limits the right of the defendant in a breach of contract suit to change his defense in the course of litigation and is thus a facet of the doctrine of good-faith performance of contracts. *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 364-65 (7th Cir. 1990). We gave another example in *S. A. Healey Co. v. Milwaukee Metropolitan Sewerage District*, 60 F.3d 305, 310 (7th Cir. 1995): "Suppose a state (as many states have done) establishes a compulsory arbitration mechanism in medical malpractice cases in order to cut down on litigation and reduce malpractice insurance premiums. The state's goals are substantive—designed to shape conduct outside the courtroom and not just improve the accuracy or lower the cost of the judicial process—though the means are procedural. The goals would be thwarted if parties having access to a federal district court under the diversity jurisdiction could thumb their noses at the compulsory procedure." In contrast, the holding of the *Walker* decision that consumer protection suits can't be maintained under Tennessee law as class actions was a "plain meaning" statutory interpretation and did not suggest that the class action had been precluded in consumer protection suits in order to advance a substantive policy concerning consumer protection.

Still, Sears is on to something. Even though the plaintiff bases his claim, and that of any other Tennesseans who happen to be members of the class, on Tennessee law, he

and they are seeking a breadth of relief that Tennessee does not offer them in its courts. Maybe that is a defect of Tennessee law. But the purpose of the diversity jurisdiction is to protect out-of-state residents against state judicial bias in favor of residents; it is not to expand the relief obtainable under state law.

The concerns that we have expressed (which are amplified, and supported by copious references, in our opinion in *In re Rhone-Poulenc, Inc.*, *supra*, and in such later opinions, apart from those cited already, as *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672 (7th Cir. 2001); *Blair v. Equifax Check Services, Inc.*, 181 F.3d 832, 834 (7th Cir. 1999); *Parker v. Time Warner Entertainment Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003), and *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 165-68 (3d Cir. 2001)) suggest caution in class certification generally. And this case turns out to be a notably weak candidate for class treatment. Apart from the usual negatives, there are no positives: not only do common issues of law or fact not predominate over the issues particular to each purchase and purchaser of a "stainless steel" Kenmore dryer, as Rule 23(b)(3) of the Federal Rules of Civil Procedure requires, but there are *no* common issues of law or fact, so there would be no economies from class action treatment.

The plaintiff claims to believe that when a dryer is labeled or advertised as having a stainless steel drum, this implies, without more, that the drum is 100 percent stainless steel because otherwise it might rust and cause rust stains in the clothes dried in the dryer. Do the other 500,000 members of the class believe this? Does *anyone*

believe this besides Mr. Thorogood? It is not as if Sears advertised the dryers as eliminating a problem of rust stains by having a stainless steel drum. There is no suggestion of that. It is not as if rust stains were a common concern of owners of clothes dryers. There is no suggestion of that either, and it certainly is not common knowledge. (At argument the plaintiff's lawyer, skeptical that men ever operate clothes dryers—oddly, since his client does—asked us to ask our wives whether they are concerned about rust stains in their dryers. None is.) Stainless steel appliances are common even when no issue of rust is presented. A porcelain sink does not rust, but many people prefer a stainless steel sink, partly because it does not stain, partly because when polished it looks better (some people think) than porcelain, but not because they think a sink made of "mild" steel coated with ceramic would cause rust stains on their dishes; ceramic doesn't rust. It is true that the drum is inside the dryer, and you just see its shiny surface when you open the door; but the same is true of dishwashers, many of which are stainless steel too.

Stainless steel clothes dryers are not advertised as preventing rust stains on clothes. The only reference to rust in Sears's marketing that the plaintiff refers to or that we have found is "Stainless Steel Drum resists rust and won't chip, peel or snag clothes." The only thing potentially deceptive about this claim is that a ceramic coating on non-stainless steel is unlikely to rust, chip, peel, or snag clothes either. But that is not Mr. Thorogood's complaint. His concerns are idiosyncratic. A further indication of this is that to rally fellow victims of the

stainless steel Kenmores he posted his bad experience on a web site ("Fight Back.com," http://fightback.com) that advertises itself as a "conduit for consumer problem solving and redress." No one responded, as the "feed back" file on the web site invites persons who agree with a posted complaint to do.

The evaluation of the class members' claims will require individual hearings. Each class member who wants to pursue relief against Sears will have to testify to what he understands to be the meaning of a label or advertisement that identifies a clothes dryer as containing a stainless steel drum. Does he think it means that the drum is 100 percent stainless steel because otherwise his clothes might have rust stains, or does he choose such a dryer because he likes stainless steel for reasons unrelated to rust stains and is indifferent to whether a part of the drum not easily seen is made of a different material? Sears does not advertise its stainless steel drum as a protection against rust stains on clothes; it does not even say that the drum itself will not rust—only that it "resists rust." Advertisements for clothes dryers advertise a host of features that might matter to consumers, such as price, size, electrical usage, appearance, speed, and controls, but not, as far as anyone in this litigation has suggested except the plaintiff, avoidance of clothing stains due to rust.

In granting class certification, the district judge said that because "Sears marketed its dryers on a class wide basis . . . reliance can be presumed." Reliance on what? On stainless steel preventing rust stains on clothes? Since

rust stains on clothes do not appear to be one of the hazards of clothes dryers, and since Sears did not advertise its stainless steel dryers as preventing such stains, the proposition that the other half million buyers, apart from Thorogood, shared his understanding of Sears's representations and paid a premium to avoid rust stains is, to put it mildly, implausible, and so would require individual hearings to verify.

An additional variable in the class action calculus is relief. Even if some consumers, like Mr. Thorogood, would not pay a premium for a stainless steel drum that was not 100 percent stainless steel, the amount of damages will vary from consumer to consumer. Some may (though we are dubious) have experienced rust stains, or be fearful of experiencing them, and therefore seek as damages the difference between the resale value of their stainless steel dryer and what a new dryer would cost. Some may have bought a Kenmore at a discount and so ended up paying no more than they would have paid for a machine with a porcelain drum. And some—because the stainless steel drum is packaged with other premium features rather than offered as a separately priced option—may have incurred no damages at all because on the whole they prefer their stainless steel dryer to any other dryer they could buy even if the stainless steel feature itself was a neutral or even negative consideration in their purchasing decision. The plaintiff is seeking on behalf of himself and the members of the class actual damages, not statutory damages, which might not require individual proof.

The difficulty of determining the relief to which the individual class members are entitled, though serious, is not the deal breaker. If it were proved that *X* thousand buyers of Kenmores had been deceived, a settlement that provided each with an amount equal to an estimate of the average damages they had sustained would be a sensible and legally permissible alternative to remitting all the buyers to individual suits each of which would cost orders of magnitude more to litigate than the claims would be worth to the plaintiffs. "Aggregate class proof of monetary relief may . . . be based on sampling techniques or other reasonable estimates, under accepted rules of evidence." 3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 10.3, p. 480 (4th ed. 2002); see also *id.*, § 10.5; *Stewart v. General Motors Corp.*, 542 F.2d 445, 452-53 (7th Cir. 1976); *United States v. City of Miami*, 195 F.3d 1292, 1299-1300 (11th Cir. 1999); *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 259-63 (5th Cir. 1974). The deal breaker is the absence of any reason to believe that there is a single understanding of the significance of labeling or advertising clothes dryers as containing a "stainless steel drum."

The district court is instructed to decertify the class.

REVERSED.